THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

THE LAW OFFICES OF

**BURNS, SCHALDENBRAND & RODRIGUEZ**

EDWARD BURNS, ESQ., STATE BAR NO. 201913
FREDERIK SPIESS, ESQ., STATE BAR NO. 221421
1155 SPORTFISHER DRIVE, SUITE 120
OCEANSIDE, CALIFORNIA 92054
TELEPHONE: 760 453 2189
FACSIMILE:  760 453 2194
BURNS EMAIL: ewburns@bsrlawyers.com
SPIESS EMAIL: frederik.spiess@bsrlawyers.com

THE LAW OFFICES OF

**AFFELD, GRIVAKES & ZUCKER, LLP**

GREGG ZUCKER, ESQ., STATE BAR NO. 166692
VICTORIA NIEWRZOL, STATE BAR NO. 282889
2049 CENTURY PARK EAST, SUITE 2460
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310 979 8700
FACSIMILE:  310 979 8701
ZUCKER EMAIL: gz@agzlaw.com
NIEWRZOL EMAIL: vn@agzlaw.com

THE LAW OFFICES OF

**DAVID ELLIOT, ESQ.**

STATE BAR NUMBER 270381
110 WEST A STREET, SUITE 750
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 858 228 7997
FACSIMILE:  619 255 1856
EMAIL: elliot.david@hotmail.com

ATTORNEYS FOR THE PLAINTIFFS

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| DION BARNETT;<br>DANNY DALLAS;<br>CHRISTOPHER GARNER;<br>RODNEY RAY ROBERTS;<br>JEREMY ROMO;<br>COREY LAMAR SMITH.<br><br>INDIVIDUAL PLAINTIFFS,<br>v.<br><br>JEFFREY A. BEARD, PH.D.,<br>SECRETARY OF THE CALIFORNIA<br>DEPARTMENT OF CORRECTIONS<br>AND REHABILITATION (CDCR); | CASE NO. _____<br><br>**I.   COMPLAINT FOR VIOLATION OF 42 U.S.C. § 1983**<br><br>**(CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE 8TH AMENDMENT)**<br>**(TWO COUNTS)**<br><br>**II.   STATE LAW PREMISES LIABILITY CLAIM**<br><br>**(GOV. CODE § 835)**<br><br>**DEMAND FOR JURY** |

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAUL D. BRAZELTON, CURRENT WARDEN, PLEASANT VALLEY STATE PRISON;

EDMUND G. BROWN, GOVERNOR OF THE STATE OF CALIFORNIA;

MATTHEW CATE, FORMER SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION;

JAMES D. HARTLEY, WARDEN AVENAL STATE PRISON;

SUSAN L. HUBBARD, FORMER DIRECTOR, DIVISION OF ADULT OPERATIONS;

DEBORAH HYSEN, CHIEF DEPUTY SECRETARY, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

DR. FELIX IGBINOSA, MEDICAL DIRECTOR, PLEASANT VALLEY STATE PRISON;

J. CLARK KELSO, THE HEAD OF THE CALIFORNIA CORRECTIONS HEALTH CARE SERVICES;

TANYA ROTHCHILD, FORMER CHIEF OF THE CLASSIFICATION SERVICES UNIT;

ARNOLD SCHWARZENEGGER, FORMER GOVERNER OF THE STATE OF CALIFORNIA;

STATE OF CALIFORNIA, A PUBLIC ENTITY;

DWIGHT WINSLOW, M.D., FORMER MEDICAL DIRECTOR, CDCR;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JAMES A. YATES, FORMER
WARDEN OF PLEASANT VALLEY
STATE PRISON; AND

UNKNOWN DEFENDANTS 1-100,

                    DEFENDANTS.

# <u>TABLE OF CONTENTS</u>

PREFACE ................................................................................. 1

I. INTRODUCTION.................................................................. 2

II. JURISDICTION AND VENUE................................................ 4

III. THE DEFENDANT PARTIES................................................ 5

IV. FACTUAL ALLEGATIONS................................................... 9

    A. The Threat of Coccidioidomycosis. ................................. 9

    B. The Risks of Valley Fever Are Well Known..................... 13

    C. Defendants' Knowledge That Certain Groups
       Are Particularly Susceptible. ............................................ 20

    D. Defendants Had Specific, Actual Knowledge of
       the Risk to Plaintiffs......................................................... 23

V. THE PRISON TRANSFER SYSTEM....................................... 29

    A. CDCR Could Have Assigned or Transferred Every
       Susceptible Inmate Away from the Danger....................... 29

    B. Existing Procedures Could Easily Have Been Adapted to
       Prevent At-Risk Individuals from Receiving Initial
       Assignment to Hyper-Endemic Prisons............................. 31

    C. CDCR'S Routine Periodic Review Process Could Easily
       Have Identified High-Risk Individuals for Transfer to
       Safer Facilities.................................................................. 32

    D. At-Risk Inmates Could Easily Have Been Transferred
       to Safer Prison.................................................................. 33

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

E.      Susceptible Inmates Could Have Been Transferred to Out-of-State Prison Facilities.............................................. 35

VI.     EXEMPLARY DAMAGES.................................................... 38

VII.    PLAINTIFFS.................................................................... 45

        PLAINTIFF DION BARNETT........................................ 45

        PLAINTIFF DANNY DALLAS....................................... 47

        PLAINTIFF CHRISTOPHER GARNER....................................... 50

        PLAINTIFF RODNEY RAY ROBERTS........................................ 53

        PLAINTIFF JEREMY ROMO........................................ 55

        PLAINTIFF COREY LAMAR SMITH........................................ 58

VIII.   PLAINTIFFS' FIRST CLAIM FOR
        VIOLATION OF THE EIGHTH AMENDMENT........................ 60
        (Count 1: Policies and Practices of Unconstitutional
        Transfer to Dangerous Area)

        A.      Qualified Immunity.............................................. 65

IX.     PLAINTIFFS' FIRST CLAIM FOR
        VIOLATION OF THE EIGHTH AMENDMENT........................ 66
        (Count 2: Deliberate Indifference to Inmate Health
        by Prison Medical Officials)

X.      PLAINTIFFS' SECOND CLAIM FOR
        CALIFORNIA STATE LAW PREMISES
        LIABILITY.................................................................. 69

PRAYER FOR RELIEF.......................................................... 70

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

# TABLE OF AUTHORITIES

<u>Cases</u>

*Akhtar v. Mesa*
    698 F.3d 1202 (9th Cir. 2012). ........................................................ 4

*Bivens v. Six Unknown Named Agents*,
    403 U.S. 388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971). .............................. 4, 8

*Booth v. Churner,*
    532 U.S. 731 (2001) ....................................................................... 4

*Brown v. Plata*,
    563 U.S. __ , 131 S.Ct. 1910 (2011). ................................................ 44

*Cody v. Hillard*,
    599 F.Supp. 1025 (D.S.D. 1984) ..................................................... 61

*Dang v. Cross*,
    422 F.3d 800, 807 (9th Cir. 2005) ................................................... 44

*DeShaney* v. *Winnebago*,
    489 U.S. 189 (1989) ..................................................................... 60

*Estelle v. Gamble*,
    429 U.S. 97 (1981) ....................................................................... 66

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ..................................................................... 61

*Frost v. Agnos,*
    152 F.3d 1124 (9th Cir. 1998) ........................................................ 61

*Gates v. Collier*,
    501 F.2d 1291 (5th Cir.1974) ......................................................... 65

*Helling* v. *McKinney*,
    509 U.S. 25 (1993) ............................................................ 60, 61, 65

*Herman v. Holiday*
    238 F.3d 660 (5th Cir. 2001) ...................................................... 61

*Hutto v. Finney*
    437 U.S. 678 ...................................................................... 65

*Johnson-El v. Schoemehl*,
    878 F.2d 1043 (8th Cir. 1989) .................................................... 61

*Johnson v. Duffy*,
    588 F.2d 740 (9th Cir. 1978) ..................................................... 64

*Morgan v. Morgensen*,
    465 F.3d 1041 (9th Cir.2006). ..................................................... 60

*Morgan v. Woessner*,
    997 F.2d 1244 (9th Cir. 1993) .................................................... 44

*Murphy v. Wheaton*
    381 F.Supp. 1252  (N.D. Ill. 1974) ............................................... 61

*Osu Student Alliance* v. *Ray*,
    699 F.3d 1053 (9th Cir. 2012) .................................................... 64

*Powell v. Lennon*,
    914 F.2d 1459, 1463 (11th Cir. 1990) ........................................... 61

*Plata v. Brown*,
    Eastern District Case No. 01-1351.................................................. 6

*Plata v. Brown*,
    Order of Northern District Judge Thelton Henderson, filed
    June 24, 2013, Docket 2661............................................... 33, 40-44

*Ramirez v. Buena Park*,
    560 F.3d 1012 (9th Cir. 2009). .................................................... 65

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

*Rhodes v. Chapman*,
     452 U.S. 337 (1981) ................................................................ 65

*Rizzo v. Goode*,
     423 U.S. 362 (1976) ................................................................ 64

*Saucier v. Katz,*
     533 U.S. 194 (2000) ................................................................ 65

*Starr v. Baca*,
     652 F.3d 1202 (9th Cir.2011). ................................................ 62

*Taylor v. List*,
     880 F.2d 1040 (9th Cir. 1989) ................................................ 64

*Youngberg v. Romeo*,
     457 U.S. 307 (1982) ................................................................ 65

*Woods v. Carey*,
     684 F.3d 934 (9th Cir. 2012) .................................................. 71

Statutes & Rules

California Code of Administrative Regulations

     Title 15, § 3269.1 ................................................................... 28

     Title 15, § 3375(b) ................................................................. 29

     Title 15, § 3379 ...................................................................... 33

     Title 15, §§ 3379 (a)(4) .......................................................... 34

     Title 15, §§ 3379 (a)(6) .......................................................... 33

     Title 15, §§ 3379 (a)(7) .......................................................... 33

     Title 15, §§ 3379 (a)(9) .......................................................... 33

Title 15, §§ 3379(b) ................................................................................ 34

Title 15, §§ 3379(c) ................................................................................ 34

California Government Code

section 835 ...................................................................................... 7, 69

section 835.2 ....................................................................................... 69

Eastern District Local Rules

Rule 120 .................................................................................................. 4

Rule 204 .................................................................................................. 1

Federal Rules of Civil Procedure

Rule 8(a)(1) ............................................................................................. 1

United States Code

28 U.S.C. § 1391 .................................................................................... 4

28 U.S.C. § 1343 .................................................................................... 4

42 U.S.C. § 1983 .................................................................... 4, 44, 60, 66

42 U.S.C. § 1997 ................................................................................ 4, 70

42 U.S.C. § 1988 .................................................................................. 70

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

Articles, Reports, Memorandums & Other Authority

American Thoracic Society, "*Patient Information Series*," American
    Journal of Respiratory Care Medican, Vol. 184, p. 6. ..................................... 42

"*Biosafety in Microbiological and Biomedical Laboratories*," U.S.
    Department of Health and Human Services Public Health Service
    Centers for Disease Control and Prevention National Institutes of
    Health, (2009, 5th Edition). ............................................................. 10

*California Prison Beset by Deadly Valley Fever Epidemic*," Prison Legal
    News (June, 2008), Vol. 19, p. 22. ................................................. 27

Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15. ................... 21

"*Coccidioidomycosis in California Department of Corrections and
    Rehabilitation Institutions,*" CCHCS Report, October 10, 2012. ..... 19, 40, 70

"*Coccidioidomycosis in California Adult Prisons, 2006-2010*," Report,
    California Correctional Health Care Services (CCHCS). ...................... 19, 27

Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of
    Disseminated Coccidioidomycosis Cases at a US Military Hospital*,
    Mil Med. (June 2003), 168(6), 460. ................................................. 20

Dixon, *Coccidioides Immitis as a Select Agent of Bioterrorism*, Journal of
    Applied Microbiology (October 2001), 91(4):602-5. .................................... 20

Durst, Karen, "Coccidioidomycosis (Cocci) Report," CRCR memorandum
    dated October 27, 2006 to Administrative Personnel.................................... 9

Dovey & Farber-Szekrenyi, "*Inmate Patients at High Risk of Valley Fever
    Excluded from Specific Central Valley Institutions*,"  CDCR Memo
    August 3, 2006. ......................................................................... 16, 22, 43

Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008). ........ passim

Galgiani, John, et al., *Practice Guidelines for the Treatment of
    Coccidioidomycosis*, Oxford Journals (2000). ....................................... 11, 12

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

Galgiani, John, "Corrected Declaration Of John N. Galgiani, M.D. In
      Support Of Plaintiffs' Motion Re Valley Fever, April 25, 2013,
      Docket 2598 in *Plata* Eastern District Case
      No. 01-1351.............................................................   10, 11 21, 39, 43

Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious
      Diseases Journal 1217-1218. ........................................................   20

Hubbard & Winslow, "*Exclusion of Inmate-Patients Susceptible to
      Coccidioidomycosts from Highest Risk (Hyperendemic) Area
      Institutions,*" CDCR Memo, dated November 20, 2007. ............  19, 22, 43 55

Imai & Winslow, M.D.'s, Department of Correctional Healthcare
      Services, "*Letter from the Chief Physician Executive,*
      January 23, 2008. .......................................................................   24

"*Infection Hits a California Prison Hard,*" New York Times,
      December 30, 2007. ...................................................................   26

Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections
      Memo to Health Care Managers November 5,
      2004. ................................................................  11, 14, 15, 18, 23, 39

Kelso, "*Notice Of Filing Of Report And Response Of Receiver
      Regarding Plaintiffs' Motion Re Valley Fever,*" *Plata v.
      Brown*, Eastern District California No. 01-1351
      [May 1, 2013, Docket 2601]. ..................................................   41

Schmelzer and Tabershaw, *Exposure Factors In Occupational
      Coccidioidomycosis,* American Journal of Public Health and the
      Nations Health, January 1968: Vol. 58, No. 1, p. 111. ...........................   13

Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews
      (September, 1961), 25(3), p. 310. .......................................   9, 20, 39

BURNS | ELLIOT | PAYONE | SPIESS | ZUCKER

Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at p. 600 (June 1940)..................................   13

Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California,*" CDCR Memorandum June, 2007. ...................................................   18, 40

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

# PREFACE

1.      By and through their undersigned counsel, Plaintiffs bring this action to recover for injuries sustained as a result of decisions by California state officials to expose them deliberately to an infectious disease, Valley Fever.  These decisions sit in contravention of the Cruel and Unusual Punishments Clause of the Eighth Amendment, and are justiciable by this Court pursuant to its authority to resolve questions of federal constitutional law under Federal Rules of Civil Procedure, Rule 8(a)(1) and Eastern District Local Rule 204, as more fully set forth in the formal discussion of Jurisdiction and Venue in Section II, below.

2.      Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which included, without limitation: a) review and analysis of public documents published by the State of California, Department of Corrections and Rehabilitation (CDCR) and other public agencies; b) review and analysis of public filings, press releases and other publications by certain of the Defendants and other non-parties; c) review of news articles, medical and other reference sources, and postings on the State of California CDCR and correctional facility websites concerning the issues described herein; and d) review of other publicly available information concerning CDCR, the medical conditions and treatment described herein, and the individual Defendants.

# I.

## INTRODUCTION

3.     The American system of criminal justice requires that state correctional authorities carry out the exact sentence determined by the judicial process – no more and no less.  Instead, Defendants knowingly imposed on Plaintiffs a lifelong, crippling, and sometimes fatal disease in addition to their lawfully determined sentences.

4.     The disease, called Coccidioidomycosis, "Valley Fever," or "VF," is carried by a fungus-like organism that lives and reproduces in the soils in certain limited geographic areas. The organism produces spores that can infect humans if they are breathed in.  It is not contagious as between persons, but to some of those infected it can be debilitating, disfiguring, intensely painful, and if not treated quickly, accurately, and indefinitely, it can be fatal.  Over (30) prisoners have already died from the disease, and many more live with serious medical complications from it.

5.     For most who contact the spores, the encounter is likely to lead to a relatively mild form of the disease, with mild or moderate flu-like symptoms or no symptoms.  But for some, particularly those in certain ethnic and racial groups, notably African Americans and Filipinos, and to a lesser extent other Asians, Hispanics, and American Indians, and for anyone who may be immune-compromised or immune-suppressed, such as those taking medication for chronic arthritis, the disease can rapidly progress to its disseminated form

6.     Disseminated coccidioidomycosis attacks multiple organ systems including the skin, lungs, eyes, bones, joints, nervous system and brain. Victims of the disseminated form require lifelong treatment and may lose limbs to amputation, require sections of bone or whole organs to be removed, may suffer disfiguring skin lesions, and if the disease attacks the brain may suffer permanent brain damage or die from meningitis.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

7.      Plaintiffs are inmates and former inmates of the state correctional system who contracted Valley Fever as a result of Defendants' recklessness. Plaintiffs were required to serve their lawful sentences. They did not also deserve a life-long debilitating illness as a result of the penal system's deliberate indifference to their health.

8.      Defendants knew that placing inmates in prisons where the prevalence of spore-laden soils was a known hazard – where Valley Fever was already occurring at epidemic rates – posed an unacceptable risk of irreparable harm to them.  Yet Defendants not only placed Plaintiffs in harm's way, they also failed to implement even rudimentary measures recommended by the correctional authority's medical experts to protect Plaintiffs from the disease.

9.      Defendants could have taken any of several actions to prevent Plaintiffs from contracting the disease.  High-risk prisoners could have been diverted or transferred away from the so-called hyper-endemic prisons.  Or, as their own staff experts repeatedly recommended, Defendants could have implemented soil control measures at the prisons to reduce inmate exposure, basic tasks like paving, landscaping, and soil stabilization.  And, prison medical authorities repeatedly recommended improved ventilation systems or that existing ventilation systems be properly maintained to protect inmates against indoor exposure to the spores, none of which prison Defendants implemented.

10.     Instead, Defendants authorized major construction, which churns the soil and throws the spores into the air, immediately adjacent to one of the most dangerously infectious prisons.

11.     Defendants failed to take even the above, straightforward protective measures, and continued to transfer high-risk inmates to the hyper-endemic prisons, knowingly exposing them to serious disease risks and demonstrating a reckless indifference to Plaintiffs' safety, health, and constitutional rights.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

## II.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction pursuant to Title 28 U.S.C. § 1343(3).  The individual Defendants are persons who have deprived Plaintiffs of their federally-guaranteed constitutional and civil rights under color of state law in violation of Title 42 U.S.C § 1983.

13.   Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391(b)(1), as this judicial district is the residence of one or more of the Defendants, and all of the Defendants are believed to be residents of the State of California, and pursuant to Local Rule 120(d) of the Eastern District, the action is filed in Sacramento County for the convenience of the defendant witnesses.

14.   The true names and capacities, whether individual, corporate, associate, governmental or otherwise of some of the Defendants herein are presently unknown to Plaintiffs.  Plaintiffs will seek leave of the Court to amend this Complaint to show the true names and capacities of such Defendants if and when these are ascertained by Plaintiffs, consistent with the holding in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 390, fn. 2, 91 S.Ct. 1999, 2001, 29 L.Ed.2d 619 (1971).

15.   Plaintiffs, each and all, have exhausted all available and necessary administrative remedies as required by 42 U.S.C. § 1997(e) and *Booth v. Churner*, 532 U.S. 731 (2001).  Plaintiffs' administrative complaints were sufficient to put prison authorities on notice of the nature of wrong for which redress was sought.[1]

16.   Plaintiffs are informed and believe, and therein on information and belief allege, that each and every act or event was done, caused, suffered, allowed, or committed by Defendants, or by any of them, or was done, caused, suffered, allowed, and permitted by each and every Defendant, within the scope and course of his or her duties as the agent, principal, or partner, of each and every other Defendant.

---

[1] *See Akhtar v. Mesa*, 698 F.3d 1202, 1211 (9th Cir. 2012).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

## III.

### THE DEFENDANT PARTIES

17.     Defendant Jeffrey A. Beard is the current Secretary of the California Department of Corrections and Rehabilitation (CDCR); he assumed that position as of December, 2012.  CDCR is the agency that administers all of California's prisons and is responsible for all its prisoners.  CDCR has approximately 170,000 prisoners under its authority and has a budget of $9 billion, making it the State's largest agency. As Secretary of the correctional authority, Beard is responsible for the policies and practices of the organization. In setting and maintaining those policies and practices, Beard personally acted to deprive Plaintiffs of their rights and failed to act to protect Plaintiffs from the constitutional injuries detailed herein.

18.     Defendant Paul D. Brazelton is the current warden of Pleasant Valley State Prison (PVSP).  In the face of unrelenting epidemic rates of infection, he failed to take any action to prevent at-risk inmates including Plaintiffs from contracting Valley Fever.

19.     Defendant Edmund G. Brown is the current Governor of the State of California, having succeeded Former Governor Arnold Schwarzenegger in January 2011. Governor Brown had the authority and the means to establish or to discontinue correctional authority policies and practices, including the policies that directed the transfer and the continued housing of Plaintiffs at unconstitutionally dangerous prisons..

20.     Defendant Matthew Cate oversaw CDCR from 2008-2012, when most of the unconstitutional transfers and new infection cases occurred, yet he failed to take any effective action to prevent the epidemic or prevent Plaintiffs from contracting the disease.

21.     Defendant James D. Hartley is the current warden of Avenal State Prison.  Hartley made an independent decision whether to accept certain of Plaintiffs for transfer to the hyper-endemic Avenal state prison.  Further, Mr. Hartley was and

is responsible for operations at Avenal and continued existing policy to accept vulnerable prisoners during a period of epidemic infection rates and, on information and belief, also failed to implement basic recommended environmental protective measures as described herein.

22.   Defendant Dr. Susan L. Hubbard is a former director of the Division of Adult Operations and was personally involved in the decision to adopt a policy, as reflected in her memorandum dated November 20, 2007, that continued to allow Plaintiffs and others who were members of high-risk groups to be housed at hyper-endemic prisons.  The exclusion policy recognized the significant health risk to a few types of medically-compromised inmates, but failed to acknowledge (80) years of scientifically-accepted fact that African-Americans and Filipinos, at a minimum, were also at unacceptable risk for Valley Fever.

23.   Defendant Deborah Hysen is the Chief Deputy Secretary, CDCR Executive Office of Facility Planning, Construction and Management.  Defendant Hysen, after identifying environmental mitigation measures that could have reduced the risk to Plaintiffs, failed to implement any such mitigation measures at the hyper-endemic prisons.

24.   Defendant Dr. Felix Igbinosa is the medical director of Pleasant Valley State Prison.   As the medical leader at PVSP, he was keenly aware of the medical risks to Plaintiffs, yet failed to adopt or recommend practices or policies to address the epidemic incidence rates.

25.   Defendant J. Clark Kelso is the current head, as Receiver, of the California Corrections Health Care Services Unit (CCHCS). [2]   He is responsible for

_____

[2] CCHCS is the agency of the State of California that has been responsible for the health care of the State of California's prison system since October 3, 2005, after the *Plata* case successfully established that prison health care violated the Eighth Amendment.  *Plata v. Brown*, Case No. 01-1351 [Northern District of California].  A court order in *Plata* directed the takeover of the prison's substandard care by this

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

the failure to adequately prevent, detect and/or treat the extensive Valley Fever problem in the prison health system.  On information and belief, CCHCS had the authority to prevent at-risk prisoners from entering hyper-endemic prisons and/or the authority to transfer them out upon arrival based on an unacceptable risk to their health.   Defendant Kelso was informed of the risks to but failed to establish adequate policy measures within his power to protect them.

26.   Defendant Tanya Rothchild is the former chief of the Classification Services Unit.  She authorized the transfer of inmates to the hyper-endemic prisons, including ones with epidemic infection rates, without regard to inmate health needs or medical risk.  Furthermore, despite Title 15 regulations that allow the CSU to consider the inmate's needs, on information and belief, inmate health needs were not considered except to a very limited degree.

27.   Defendant Arnold Schwarzenegger is the former Governor of California, and acted in that position from 2003 through 2011.  The Valley Fever epidemic at California prisons continued unabated during Governor Schwarzenegger's tenure.  Mr. Schwarzenegger, as Governor, had the authority to establish policies and practices, such as excluding known high-risk inmates from endemic prisons, which would have prevented Plaintiffs from being exposed to and subsequently contracting Valley Fever.  However, he failed to take any action to do so and proactively announced that he was willing to send more inmates into harm's way.

28.   Defendant State of California is a public entity within the meaning of Government Code section 835 and is named with respect to Plaintiffs' Claim for Premises Liability, as set forth in Claim Two.

29.   Defendant Dwight Winslow, M.D. is the former Statewide Medical Director and made recommendations to mitigate the risk of contraction in a June, 2007 memo, was aware of the epidemic rates and adopted a stated goal of reducing

---

agency and it has since then been legally responsible for overseeing 7,000 staff addressing prisoner health care.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

rates to that of the local population.  However, he adopted a policy just three months later, in a November, 2007 memorandum, that under-assessed the pool of at-risk inmates, particularly by its failure to include, at a minimum, African-American and Filipino inmates.  He thus personally participated in the decision to adopt a policy that recognized the danger of Valley Fever and yet still allowed the vast majority of high-risk, and all other, inmates to be transferred to hyper-endemic prisons.

30.     Defendant James A. Yates is the former warden of Pleasant Valley State Prison and appears to have been the warden since at least 2005.  Yates was certainly aware of the epidemic Valley Fever contraction rates occurring at his own prison, and yet he failed to adopt any policies or practices to prevent Plaintiffs from contracting Valley Fever.

31.     Unknown Defendants 1-3 are one or more head officials of the Classification Services Unit, a division of the California Department of Corrections and Rehabilitations, which developed the policies and practices that governed the decisions to transfer particular Plaintiffs to particular hyperendemic-area prisons.

32.     Unknown Defendants 4-15 are one or more of the respective assistant chiefs of the Classification Services Unit, a division of the California Department of Corrections and Rehabilitations, which authorized the supervisory decision to transfer particular Plaintiffs to particular hyperendemic-area prisons.

33.     Unknown Defendants 16-50 are one or more of the respective assistant chiefs and staff representatives of the Classification Services Unit, a division of the California Department of Corrections and Rehabilitations, which made the decision to transfer particular Plaintiffs to particular hyper-endemic-region prisons.

**34.**     Unknown Defendants 1-50 as named above, and 51-100 additional unknown defendants involved in the policies that led to Plaintiffs' injuries, or were directly involved in Plaintiffs' substandard care, are named herein pursuant to the convention of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 390, fn. 2, 91 S. Ct. 1999, 2001, 29 L. Ed. 2d 619 (1971).

# IV. FACTUAL ALLEGATIONS

## IV(a)

### The Threat of Coccidioidomycosis

35.    Coccidioidomycosis has long been known as a dangerous parasitic disease caused by the inhalation of airborne fungal spores of the Coccidioides Immitis organism found in soil in certain locations in California and the Southwest.

36.    When a human inhales the Coccidioides fungal spores, those spores may lodge in various locations in the respiratory system. The spores then grow and transform into large tissue-invasive parasitic spherules.  These spherules enlarge and rupture, each releasing as many as thousands of new "endospores" that can invade surrounding tissue or can migrate through the blood to other tissues and organs, where they repeat the process and continue to multiply in the body.

37.    The developing endospores grow on host body tissue, dissolving some of that tissue in the process.  Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain.  Lesions may occur in every organ in the body.[3]

38.    Coccidioides replicates so quickly that it is considered the most virulent fungal parasite known to man.[4]  The Centers for Disease Control (CDC) requires scientists handling Coccidioides spores to use protective protocols just one level below that used for handling the hemorrhagic fever Ebola virus.[5] [6]

---

[3] Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 310-320, at p. 311.

[4] Dixon, *Coccidioides Immitis as a Select Agent of Bioterrorism*, Journal of Applied Microbiology (October 2001), 91(4):602-5.

[5] In 2008, two researchers published a book titled, Valley Fever Epidemic, as a reference for those suffering from the disease.  The Filip book relies on 268 different medical studies, professional journal articles and other authoritative material concerning Coccidioidomycosis.  Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip").

39.     Filip notes that the Coccidioides fungus was at one time listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism – in the Antiterrorism and Effective Death Penalty Act of 1996 and the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002, though it was subsequently delisted as treatments became available for it. Filip, p. 2.

40.     Coccidioides is not transmitted between humans or animals, and not everyone who breathes in the Coccidioides fungal spores becomes seriously ill. Sources suggest that some 60% of people who are exposed to the Coccidioides fungus do not show overt symptoms of illness; their disease-fighting systems overcome the exposure without medical treatment and they are thereafter apparently immune to the dangers of contracting Valley Fever.

41.     In the general population, most of the remaining 40% will show symptoms of a respiratory illness resembling the flu that may last weeks or months.[7]

42.     In a percentage of those exposed, however, which varies greatly depending on the ethnicity and medical status of the group, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as the disseminated infection.[8]

43.     Disseminated infection most commonly involves skin and soft tissues, bones, and the central nervous system.  Both the spore-provoked pneumonia and the disseminated infection, especially meningitis, can be fatal.[9]

---

[6] "*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health, (2009, 5th Edition).

[7] Dec. John Galgiani, ¶ 7 (April 25, 2013, Docket 2598 in *Plata* Eastern District case), Valley Fever expert.

[8] Galgiani, ¶ 7.

[9] Id.

44.     Per <u>Filip</u>: "Valley Fever can kill, but it can also affect its survivors for a lifetime.  It can disseminate to the eyes where it can cause blindness and possibly require the removal of an infected eye.  Valley Fever can attack any organ or limb in the body to cause lesions, chronic pain, and to require amputations.  Some cases can necessitate surgical removal of an infected lung… ."  Valley Fever can cause facial lesions that leave permanent scarring and disfigurement.  In the most lethal varieties of the disease it can attack the lining of the brain (meninges), [leading to] permanent brain damage.  Valley Fever can infect the bones and joints, causing chronic debilitation, pain, and resulting in the need for joint fusions or amputations ...  people with Valley Fever have become wheelchair bound as a result of disseminated spinal lesions... ."[10]

45.     Once the disease is established in the disseminated form, there is no cure.  The disease is treated with antifungal drugs which can have severe side effects and must be taken for a lifetime.  These drugs do not cure the disease, however, since they only reduce but do not eliminate the population of infectious spores.  Continuous treatment with oral anti-fungal medication may keep the disease temporarily at bay, but the disease remains within an infected person for his or her lifetime and repeated debilitating relapses may be expected.  As many as 75% of patients who stop taking the drugs will relapse within a year.[11]

46.     Treatment of Valley Fever is expensive, for the patients and for the public health system.  "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment.  For managing critically ill patients with

---

[10] <u>Filip</u>, at pp. 63-65.

[11] *See, e.g.,* <u>Filip</u>, p. 40; Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers November 5, 2004 [hereinafter "Kanan" or "Kanan Memo"], p. 4; Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

coccidioidomycosis, there are considerable additional costs including intensive care support for many days or weeks."[12]   Some patients require repeated hospitalization for the disseminated disease.  The cost for such treatment is estimated to be in the range of $35,000 per episode.

47.     Plaintiffs in this case, who have had Valley Fever for relatively short amounts of time, have already reported one or more of the following symptoms:  skin lesions; fever; shortness of breath and/or wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain.

48.     Over thirty inmates have died from exposure to the disease within the prison system from 2005 to the present and countless more will die prematurely.

---

[12] Galgani, *Practice Guidelines*, at p. 659.

## IV(b)

## The Risks of Valley Fever Are Well Known

49.     California officials have known about the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the disease's acute risks to inmate health for over (50) years.[13]

50.     By the late 1960's, employers were being warned that "the importation of any susceptible labor force into the endemic areas carries with it the responsibility for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[14]

51.     Despite this, between 1987 and 1997, the CDCR built eight prisons within the endemic and hyper-endemic regions of San Joaquin Valley:   Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison at Corcoran; and Kern Valley State Prison.

52.     Though all of these prisons presented an elevated, unacceptable risk of exposing inmates to Valley Fever, one in particular, Pleasant Valley State Prison, was extraordinarily dangerous.

53.     Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates.  It was opened in November 1994, covers 640 acres and

---

[13] *See* Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at p. 600 (June 1940).

[14] Schmelzer and Tabershaw, *Exposure Factors In Occupational Coccidioidomycosis,* American Journal of Public Health and the Nations Health, January 1968: Vol. 58, No. 1, p. 111.

was designed to house 3,000 inmates.  Today, there are approximately 730 staff and 5,188 prisoner beds.

54.     The soil surrounding PVSP, that the prison is built on, is densely contaminated with the Coccidioides fungus.  Yet Defendants have failed to take even the most basic precautions to guard against exposure.

55.     There are broad expanses of bare dirt, without any vegetation at all, on the prison grounds, which allows the free circulation and spread of the cocci spores from the prison yard soils into the air and into the buildings' ventilation systems.

56.     In November 2004, before the drastic rise in incidence rates at PVSP, Defendant Renee Kanan, M.D., Deputy Director of Health Care Services at CDCR, wrote a memorandum to all health care managers, staff members, and other officials within CDCR regarding Valley Fever and its origin in soil fungus.

57.     The Kanan Memo included a three-page overview of Valley Fever, its cause, diagnosis, symptoms and treatment.  The memorandum admitted that: (a) the Central Valley prisons are located within areas which host the dangerous cocci fungus in the soil (b) Valley Fever has "potential lethality" for people exposed to the fungus;  (i) "winds and construction activity may cause the organism to be blown into the air where it can be inhaled and pneumonia can occur"; (ii) "[a] percentage of individuals exposed to coccidioides immitis .. will progress to frank, generally patchy pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease"; (iii) "[t]he risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks and immuno-compromised individuals" (iv)"[d]issemination usually occurs to the skin, bones and meninges, although any part of the body can be involved"; (v) bone lesions, back pain and paraplegia may result from Valley Fever; (vi) skin lesions "imply a poor prognosis and often herald widespread dissemination"; (vii) "[m]eningeal involvement eventually leads to a severe, unremitting headache" and (vii) "[t]reatment must be continued for life to

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

maintain control of symptoms; there is no cure for coocidioidal meningitis at this time."

58.    Dr. Kanan's memo was and continues to be widely available after it was distributed to CDCR health officials. [15]

59.    Starting in 2005, shortly after the Kanan memo was distributed and approximately (5) years before the earliest claim made by a plaintiff in this lawsuit, Pleasant Valley State Prison (PVSP) began to experience an epidemic of Valley Fever, including multiple deaths from the disease.

60.    Infection rates at PVSP during this time were as much (1,000) times the rate seen in the local population, yet state officials continued to transfer susceptible and non-susceptible inmates alike to this prison.

61.    An internal CDCR memorandum dated October 27, 2006 to all administrative personnel, apparently generated at the request of Sacramento government officials, described the epidemic infection rates:

"The Cocci information requested by [California government officials in] Sacramento is as follows:

2001 – 42 inmates
2002 – 38 inmates
2003 – 80 inmates
2004 – 66 inmates          1 death
2005 – 187 inmates         5 deaths
2006 – 1145 inmates        8 deaths

---

[15] The Kanan Memo was circulated to Nadim Khoury, M.D. (Assistant Deputy Director (A), Clinical Policy and Programs Branch, Health Care Services Division of Department of Corrections); Donald Smilovitz, M.D. (Physician and Surgeon, Infection Control Department, CMC); Anita Mitchell, M.D. (Chief Medical Officer, Clinical Standards & Services (CSS), HCSD); and Tim Rougeux (Project Director, Medical Programs Implementation) and directed these individuals to "*please ensure that the attachment to this memorandum is distributed to your staff and is available for their reference in the clinical treatment areas of your facility.*"

The above information is an approximation of the number of inmates with positive Cocci lab results."[16]

62.    This memo showed that Valley Fever incidence rates increased at PVSP by more than 445% between 2001 and 2005, and by over 2,500% by 2006.

63.    An April, 2012 retrospective study found that the infection rate at PVSP was approximately 7,011 cases for every 100,000 people, or 7 out of every 100.

64.    After the 2005 outbreak at PVSP, California Corrections Health Care Services (CCHCS) requested and received assistance from the California Department of Public Health (CDPH) in assessing and controlling cocci at PVSP.  CDPH confirmed that at least 29 persons had to be hospitalized, and (4) deaths.

65.    The rate of cases at PVSP was (38) times the rate in residents of Coalinga, and (600) times the rate in Fresno County.  CDPH reported associations of disease with increased outdoor time, pre-existing health conditions, and African-American race.  CDPH concluded their report with specific recommendations for reducing coccidioidomycosis among the California Department of Corrections and Rehabilitation.

66.    In 2006 (through mid-August), the California prison system accounted for 30% of all Valley Fever cases reported to the State Department of Health Services.

67.    An August 3, 2006 internal memorandum confirmed that Defendants knew that they were housing inmates in hyper-endemic regions of the State.[17]

---

[16] Durst, Karen, "Coccidioidomycosis (Cocci) Report," [CRCR memorandum dated October 27, 2006 to Administrative Personnel].

[17] *See* Dovey & Farber-Szekrenyi, "*Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions,*" p. 1 [CDCR Memo August 3, 2006, hereinafter "Dovey"].

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

68.     During 2006-2010, rates of Valley Fever in the hyper-endemic area prisons worsened.  The rates at Pleasant Valley State Prison, Avenal State Prison, Wasco State Prison, and North Kern State Prison, were each significantly higher than rates in the counties in which they are located.  In comparison with the rate in California (7/100,000), the rate at PVSP was 1,001 times higher (7011/100,000), the rate at ASP was 189 times higher (1326/100,000) and the rate at WSP was 114 times higher (800/100,000).

69.     The rates at PVSP, ASP, and WSP were also much higher than the rate in Kern County, the county with the highest rate of cocci in California (135/100,000).

70.     Of the (27) state inmates who died of Valley Fever between 2006 and 2010, (18) (or 68 percent) were African-Americans, according to the report.  The rate of death due to Valley Fever among African-Americans was twice that among non-black inmates.

71.     Experts have suggested the cause of the rapid and continued increase in Valley Fever cases at PVSP in 2005/2006: new construction that was initiated next door to the prison.

72.     Defendants and other government officials heightened the risk to inmates at PVSP when they decided to construct the state's new mental hospital immediately adjacent to the prison, Coalinga State Hospital (CSH), less than 200 yards away.

73.     Dr. Pappagianis' report describes "the influence of 'new construction' (including excavation)" on PVSP's Valley Fever rates as follows: "Construction began in late Summer to early Fall [2005] and soon the number of cases increased. … It was evident that PVSP had a higher rate of infections than other institutions some of which had comparable numbers of inmates.  By mid-August 2006, PVSP had 300 new cases recognized, far exceeding those recognized (51) [at] Avenal, the next highest represented.  We calculated incidence of 3,000/100,000 for PVSP in 2005; and in 2006 up to mid-August the rate was 6,000/100,000.  For comparison, the

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

highest incidence rate of [Valley Fever] was 572/100,000 for Kern County during the epidemic year 1993.[18]

74.     The excavation and construction adjacent to the prison churned an inordinate amount of the endemic *Coccidioides* fungal spores into the ambient air in and around the prison.[19]

75.     Defendants recklessly exposed the inmate population and failed to take any adequate precautions to protect inmates from the spores that would inevitably migrate onto the PVSP grounds and facility as a direct result of the disruption of the soil caused by the construction.

76.     After the CDHP report, CCHCS issued a number of recommendations in June, 2007, which included: (i) proceeding with environmental mitigation in the prisons through landscaping with ground cover, and placing concrete and other dust reducing materials on the grounds; (ii) *continue the diversion and relocation of inmates at high risk for coccidioidomycosis*; (iii) reinstate the public health system in prisons; (iv) notify the local health departments of new cases identified by prison providers; (v) expand epidemiologic research around cocci; (vi) support vaccine research; (vii) do not expand prison beds in the hyper-endemic area, especially at Pleasant Valley State Prison.

77.     In November, 2007, prison health officials issued a formal exclusion policy for the highest risk individuals (persons with serious medical compromise), but failed to exclude high-risk individuals based on well-established racial criteria, although those criteria were well-known to them from earlier memos.  Furthermore,

---

[18] Kanan Memo [Attachment 3, p. 4].

[19] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California*," p. 4, June, 2007 [hereinafter "Winslow Recommendations"].

at a time when rates were nearly (1,000) times the population rate at PVSP, the 2007 exclusion policy only excluded the very highest risk inmates.[20]

78.     From 2007 through 2010, the rate in PVSP was (6) times higher than the rate among residents of the adjacent state mental health facility built in 2005.[21]

79.     Locating so many prisons – and then significantly overcrowding them – in the highly endemic region of the Central Valley has had drastic repercussions on the health and welfare of California's inmate population, per a report dated April 16, 2012 by the California Correctional Health Care Services Public Health and Quality Management Units, titled "*Coccidioidomycosis in California's Adult Prisons 2006-2010.*"

80.     During 2009, CDCR first requested and then without explanation terminated a project by the leading federal health agencies to assist the California prison system with the Valley Fever epidemic.  In December 2009, after California officials had inexplicably canceled the project, two officials at the Centers for Disease Control (CDC) and its National Institute for Occupational Safety and Health (NIOSH), wrote to Nikki Baumrind, Ph.D, M.P.H., Chief of the Occupational and Public Health Section of the California Department of Corrections and Rehabilitation. This letter made it clear that the CDC's and NIOSH's work on the issue had ceased due to the CDCR's "lack of support" in assisting with the federal agencies' investigation.  The NIOSH officials reminded the CDCR that *"[p]eople at greater risk for developing disseminated infection include people of African American; Asian or Filipino descent; ... and immunocompromised persons"*.[22]

---

[20] Hubbard & Winslow, "*Exclusion of Inmate-Patients Susceptible to Coccidioidomycosts from Highest Risk (Hyperendemic) Area Institutions,"* [CDCR Memo, dated November 20, 2007, hereinafter "Hubbard"].

[21] "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,"* p. 2 [CDCR Report, October 10, 2012].

[22] Letter from NIOSH to CDCR, December 4, 2009, p. 2.

81.     On information and belief, then Governor Schwarzenegger announced in an October, 2011 press conference that the State's policy and practice of transferring prisoners to serve their sentences in Pleasant Valley State Prison would continue unabated.

## IV(c)
## Defendants Knew Certain Groups Were Particularly Susceptible

82.     Valley Fever has the capacity to infect any person, regardless of race, health status or immunological strength.  But it is currently undisputed and well-known that certain groups are much more likely than others to contract the potentially lethal disseminated form of Valley Fever.

83.     The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over (80) years ago.[23]

84.     An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[24]

85.     California's Department of Health Services referenced the exceptionally high-risk groups in a letter dated March 16, 2006 from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, citing an article in a contemporaneous medical journal.[25]  Anyone with a

---

[23] *See* Smith, Pappagianis, et al, <u>Human Coccidioidomycosis</u>, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

[24] <u>Filip</u>, p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*,  Mil Med. (June 2003), 168(6), pp. 460-464.

[25] *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

compromised or suppressed immune system has an increased risk of developing disseminated Valley Fever.[26]  A compromised immune system may be caused by any of several chronic diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis.  Individuals over the age of (55) have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[27]

86.     In analyzing reports from the Receiver's medical staff, Dr. Galgiani has noted that "African-American prisoners [in the Central Valley state prisons] died with Valley Fever at a higher rate than the general inmate population, and at much higher rates than African-American men in California." [28]  In fact, African-American prisoners comprised 71% of the 34 Valley Fever deaths in CDCR prisons between 2006 and 2011.[29]

87.     A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

88.     California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed

---

also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[26] *See, e.g.,* American Thoracic Society, "*Patient Information Series,*" American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

[27] Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15.   The 2011 Thoracic Society also supports this conclusion, p. 5.

[28] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 10.

[29] Id.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

patients."  The DPH in 2007 therefore concluded that exclusion of these high-risk inmates was "the most effective method to decrease risk [of Valley Fever infections]."[30]

89.     Defendants, however, persisted in disregarding this fact.  When they finally, after court order, issued a policy in 2006 to exclude what they described as high-risk prisoners from the endemic-area prisons, that policy identified only immune-compromised prisoners as high-risk.  Defendants knowingly disregarded all of the findings prior to and subsequent to issuing that policy that identified all the other risk groups, such as African-American, Filipino and certain other races, persons over (55) years of age and all of the recommendations to help minimize those risks.[31]

---

[30] CCHCS Report dated April 16, 2012 relating recommendations in Jan, 2007, p. 8, Box 2.

[31] Dovey, Hubbard memos, supra.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

### IV(d)

### Defendants Had Specific, Actual Knowledge of the Risk to Plaintiffs

90.   Each of the named Defendants was aware that housing Plaintiffs at a hyper-endemic prison posed a greatly elevated risk of contracting Valley Fever.

91.   The 2004 Kanan Memo was circulated to a number of specific health care professionals inside the prison system and was intended to be circulated to all health care managers within the Department of Corrections, for general circulation to all health care professionals in the system.

92.   In 2006-2007, a Fresno County Grand Jury undertook the task of evaluating the problematic health care at PVSP and made a series of recommendations.

93.   Beginning in 2007, the Grand Jury issued regular periodic public reports concerning Valley Fever incidence at PVSP.

94.   The Grand Jury observed that "[l]ocal prison officials are well aware of this health crisis..." and stated that inmates and staff continue to be at risk from Valley Fever.

95.   The Grand Jury issued these reports directly to Defendants Beard, Brazelton, Yates, Cate, and Kelso, as well as to other CDCR officials.

96.   The Grand Jury required Defendants Yates, Cate, Beard and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Defendant Yates also sent copies of his response at a minimum to Defendants Cate, Kelso, and other CDCR officials.

97.   The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

98.   In addition to the other sources of information available to them, some of which are discussed further below, Defendants Yates, Cate, Beard, Brazelton, and

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

Kelso were directly and personally informed by the Fresno Grand Jury findings that inmates like Plaintiffs were at drastically increased risk of contracting Valley Fever and susceptible to potentially fatal health consequences as a result, if Defendants were housed at or remained at PVSP.

99.  In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by VF, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

100. Despite his personal knowledge of this threat, in September 2007 then-Governor Schwarzenegger proposed that the state construct new dormitories at PVSP to expand by 600 the number of beds located and prisoners housed there

101. At a press conference called to announce the expansion plans, Governor Schwarzenegger responded to questions about the fact that the proposed expansion would inevitably expose more prisoners to the disease.  Defendant Schwarzenegger showed no care, concern or remorse about exposing large numbers of additional prisoners to Valley Fever at that time, in stating: "We will go ahead and build."

102. Schwarzenegger was thus fully informed that inmates housed at PVSP, and the hyper-endemic prisons in general, were at a seriously increased risk of contracting VF.

103. Further, CDCR publishes and distributes an Orientation Manual for all medical personnel.  The CDCR Correctional Healthcare Services Orientation Manual discusses the coccidioides epidemic in detail and specifically notes that African Americans, Filipinos, and those with compromised immune systems or chronic diseases are at greatly increased risk for contracting Valley Fever in its most deadly form.[32]

---

[32] Imai & Winslow, M.D.'s, Department of Correctional Healthcare Services, "*Letter from the Chief Physician Executive*, January 23, 2008.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

1   104. The orientation manual is authorized and promulgated by Dwight

2   Winslow, M.D., the Chief Physician Executive at CDCR.

3   105. All medical personnel and management at CDCR were aware of the

4   information in the Orientation Manual and its implications for inmates housed at

5   hyper-endemic prisons.

6   106. In 2006 the California Department of Public Health, Center for

7   Infectious Disease conducted an epidemiological study of Valley Fever in California

8   prisons (the "Study").  The Study was published in January 2007.

9   107. The Study found that the number of cases of VF reported at PVSP in

10  2005 was 3 times that of the entire rest of Fresno County combined.  The Study

11  reported that any persons with suppressed immune systems as a result of disease or

12  medications which are immune-suppressive, such as those for chronic arthritis, are at

13  extremely high risk of the deadliest form of VF, as are African-Americans, Hispanics,

14  Filipinos and other Asians.

15  108. The Study recommended that CDCR evaluate relocating the highest risk

16  groups to areas that are not hyper-endemic to Coccidioides, and at a minimum, to

17  take steps at the prisons to minimize exposure, including ventilation, respiratory

18  protection, and dust suppression and soil control.

19  109. Each of the Defendants was aware of the CDPH Study and familiar with

20  its conclusions regarding inmates, Valley Fever, and required and indicated

21  mitigation measures.

22  110. Further, CDCR published general-circulation memos in both 2006 and

23  2007 regarding Valley Fever at PVSP and other hyper-endemic prisons.

24  111. On information and belief, each of the Defendants received copies of

25  these memos and in the normal course of their duties was to read and understand both

26  the memos and the underlying information available to CDCR staff regarding Valley

27  Fever at PVSP.

28

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

112. In 2007, CDCR Facilities Department Senior Management officials including Defendant Deborah Hysen stated that they were preparing measures to reduce the risk to inmates of contracting Valley Fever at PVSP.

113. The planned remedial actions included extensive measures to control inmates' exposure to contaminated soils outside buildings and greatly improved ventilation systems to limit exposure inside buildings.

114. Not a single element of this remedial plan was implemented until six years later, after two contested court orders.  Reportedly the CDCR considered the remedial plan "too expensive."  The planned remedial program was estimated to cost $750,000; CDCR has since spent $23 million treating inmates infected with Valley Fever.

115. The New York Times quoted Defendant Yates in 2007 regarding the VF epidemic at his prison in a story on Valley Fever at California prisons.  Yates surmised to the Times that inmates and staff at PVSP contracted the disease by breathing in spores from the air as they "walk around out there."[33]

116. Defendant Yates was thus aware of the risks and the exposure pathways subjecting inmates at PVSP to Valley Fever.

117. In June 2007 the California Department of Health Services (CDHS) offered specific recommendations for reducing Valley Fever incidence among CDCR inmates. The CDHS recommended that CDCR should consider relocating all inmates "from this institution [PVSP] to institutions with rates of cocci equal to or better than their local community rates."[34]

118. Further, in August 2007, the Prison Legal News (PLN), a specialty periodical of extensive circulation in the prison community, ran as its cover story an

[33] *Infection Hits a California Prison Hard*," New York Times, December 30, 2007.

[34] *Winslow Recommendations*, June, 2007.

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

investigation of Valley Fever at California prisons.[35]  The PLN cover story described in detail the source, exposure pathways, prognosis, and risk factors for the disease and its endemic presence in the subject California prisons.

119. Despite their actual knowledge of the presence, the risk, and the appropriate remedial actions, Defendants took little to no action to address the unacceptable risks to CDCR inmates at these prisons or to keep susceptible inmates away from the risk.

120. In April, 2012, the California Correctional Health Care Services (CCHCS) released a report titled, "*Coccidioidomycosis in California Adult Prisons, 2006-2010.*"  The Report received general circulation among CDCR staff including specifically Wardens and Unit Managers and executives.

121. The CCHCS Report found that no action purportedly taken by CDCR between 2006 and 2010 in response to the epidemic had any effect on cocci incidence rates at PVSP and ASP.

122. The Report reiterated that Valley Fever incidence rates at the hyper-endemic prisons were drastically elevated, and that African-Americans in particular were at increased risk of contracting Valley Fever and of suffering its lethal form. The Report found that African-American inmate men died from cocci at far higher rates than un-incarcerated African-Americans in California and much higher rates than the general inmate population.

123. The CCHCS Report found that PVSP in particular had extensive areas of un-stabilized soil on its grounds, posing an extreme risk of spore release, transport, and infection and noted that simply "…planting lawns and paving roads reduced the rate of coccidiodal infection by one-half to two-thirds" based on results at a military installation that had been studied.

---

[35] "*California Prison Beset by Deadly Valley Fever Epidemic*," Prison Legal News (June, 2008), Vol. 19, p. 22.

124. The Report concluded that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis."

125. In addition to the massive numbers of inmates infected with Valley Fever, over 80 CDCR facility staff members have contracted Valley Fever to date, and at least one CDCR corrections officer has died from the disease.

126. Defendants employed by CDCR Classification Services Unit received some or all of the above-described information regarding Valley Fever incidence at the hyper-endemic prisons and were aware at all relevant times that endorsing or transferring any inmate to one of the hyper-endemic prisons posed an unacceptably high risk of contracting Valley Fever.

127. Each Defendant employed by CDCR or the State of California at all relevant times possessed sufficient information, common throughout the organization and the corrections profession, that exposure to spore-infested soils at the eight California hyper-endemic prisons posed an unacceptably high risk of life-long Valley Fever infection, illness, and death, to inmates located at the hyper-endemic prisons. At all times, Defendants have had access to information concerning an inmate's racial composition as part of his central file, and were required to possess information about inmate racial make-up for purposes of appropriate housing determinations.  See, e.g., Title 15, § 3269.1.

# V.  THE PRISON TRANSFER SYSTEM

## V(a)

### CDCR Could have Assigned or Transferred
### Every Susceptible Inmate Away from the Danger.

128. CDCR had the ability to divert all at-risk individuals away from the high-risk prisons in its initial facility assignment process.

129. CDCR had robust, systematic procedures to match inmates to facilities, but failed to use or adapt any of these procedures to identify at-risk inmates or prevent their assignment to the hyper-endemic prisons.

130. The classification scoring system that drives housing placement decisions includes the flexibility to include environmental risk to an inmate's health.[36]

131. When new inmates first enter the custody of CDCR, they undergo an initial review process designed to assign the inmate to an appropriate long-term custodial facility.[37]

132. CDCR refers to the initial review as the "Reception and Classification Process" (RCP). Inmates are housed at a temporary custody facility during the RCP, which may take as much as four months.

133. The RCP includes direct observation of the inmate and a review of an inmate's relevant personal history and personal factors, including the age of the

---

[36] *See* Title 15, § 3375(b) [allowing consideration of an inmate's "needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/ facility's program and security missions and public safety."]

[37] The inmate assignment procedure is governed by Title 15 of the California Code of Regulations, "Crime Prevention and Corrections."

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

inmate, the nature of the offense, prior incarceration history if any, and other relevant personal factors

134. At the end of the RCP, an inmate is given a classification score. The inmate then participates in a classification committee review, after which the inmate is recommended for placement at a specific institution based on their score and the committee findings. An inmate's geographical preference may but is not required to be taken into account in the assignment, for example for family proximity.

135. The inmate's classification security score generally dictates the security level of the institution the inmate is assigned to.  Facilities are designated as Level I (lowest security) through Level IV (highest security.)

136. Level I Facilities generally are open dormitories with a low-security perimeter.  Level II Facilities are open dormitories with a secure perimeter which may include armed guarding.  Level III Facilities have a secure perimeter with armed coverage; housing units or cells may be adjacent to exterior walls.  Level IV Facilities have a secure perimeter with internal and external armed guarding and cell block housing separated from exterior walls.

137. After an inmate receives the classification committee's initial assignment to an institution, an official in a separate office within CDCR must approve the assignment.  This official is referred to as the Classification Staff Representative (CSR).

138. After a final review of the inmate's case factors, the CSR reviews and approves the inmate's assignment to a specific institution. This process is called "endorsement."

139. Endorsement to an institution may take an additional 45-60 days.  The inmate may also have to wait for a bed to be available at the endorsed institution, which may take additional time.

140. Finally, a separate committee at the destination facility called the Unit Classification Committee (UCC) reviews initial program assignments, as well as all

transfers at the facility. The UCC is composed of three staff members and is chaired by an official at the level of Facility Captain or Correctional Captain.

**V(b)**

**Existing Procedures Could Easily Have Been Adapted to Prevent At-Risk Individuals from Receiving Initial Assignment to Hyper-Endemic Prisons.**

141. At any point during CDCR's redundant, protracted, multi-level and multi-factor inmate classification, assignment and review process, CDCR had the ability to incorporate a simple screen to identify inmates at risk for Valley Fever and to divert those individuals from hyper-endemic prisons.

142. CDCR's inmate classification and assignment process uses standardized forms and procedures to review numerous personal factors regarding each inmate, ostensibly in order to assign inmates only to suitable facilities.

143. At any of numerous points in this process, CDCR could have implemented simple procedures – for example, by adding a check-box to any of several standardized forms that are used in the process – to identify African-American, Asian, Hispanic, and older inmates who were particularly susceptible to Valley Fever and divert these from hyper-endemic prisons.

144. Although CDCR knew by 2005 that these individuals were in substantial danger, CDCR failed to incorporate any screen for risk factors for Valley Fever into its RCP or assignment processes in order to divert susceptible inmates to locations where they would not be exposed to the disease.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

1

**V(c)**

2

**CDCR's Routine Periodic Review Process Could Easily Have Identified**
**High-Risk Individuals for Transfer to Safer Facilities.**

3

4

5

145. CDCR conducts periodic review, typically on an annual basis, of each

6

inmate to assess the continued suitability of the current custodial facility for that

7

inmate.

8

146. An annual review is performed for each inmate by a facility staff

9

member, typically a counselor, to determine if an inmate meets standard criteria to

10

have his or her placement score changed.

11

147. In addition, a staff committee called the Unit Classification Committee

12

(UCC) periodically reviews the status of every inmate at every institution. Inmates

13

appear personally before the UCC, typically on an annual basis, to adjust their

14

classification score and re-evaluate their housing status.

15

148. During the periodic review, every aspect of an inmate's status at a

16

facility, including program participation, work groups, custody designation, and the

17

advisability of transfer out of the facility, is reviewed by the Counselor and the UCC.

18

149. CDCR had the ability to incorporate procedures into the periodic

19

facility-level Counselor's or UCC review to identify African-American, Asian,

20

Hispanic or older inmates susceptible to Valley Fever and to designate these

21

individuals for urgent transfer.

22

150. Defendants declined to take even these simple steps to protect these

23

individuals from the known substantial danger.

24

25

26

27

28

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

### V(d)

**At-Risk Inmates Could Easily Have Been Transferred to Safer Prisons.**

151. Once identified, susceptible individuals already resident at hyper-endemic prisons could have been transferred out of danger using CDCR's existing transfer processes.

152. At-risk inmates should have been transferred from hyper-endemic prisons facilities to other California facilities, either state or federal, or to out-of-state facilities.

153. CDCR has an established, robust, formal set of regulations and procedures for the transfer of inmates between correctional facilities, pursuant to Title 15, § 3379 of the California Code of Regulations.

154. CDCR "routinely transfers hundreds or thousands of inmates on a weekly basis" using these regulations and established procedures.[38]

155. Defendants' procedures include provisions for voluntary and involuntary transfers and for transfers both within and outside CCDR.

156. Inmates can be transferred not only to other CDCR correctional facilities, but can also be transferred to out-of-state correctional facilities, or to federal facilities in California, under established CDCR transfer procedures.[39]

157. Every male inmate is potentially eligible for transfer to an out-of-state facility, either voluntarily or involuntarily. [40] Inmates transferred out of state remain under the legal custody of CDCR.

158. The transfer procedure even allows for temporary placement of inmates in facilities or levels for which they are not endorsed, due to medical conditions, and includes provisions for resolving any pending disciplinary issues prior to transfer.[41]

---

[38] *Plata* Order at p. 5, fn. 3 [Docket 2661].

[39] See Title 15, §§ 3379(a)(6), (a)(7).

[40] *See* § 3379(a)(9).

159. Inmate transfers may be ordered by CDCR executive or administrative staff or can be initiated at the facility level. Either a Warden or the UCC committee at each facility may on their own initiative arrange for inmate transfers.

160. Further, any warden or supervisor can temporarily suspend a pending inbound transfer.[42]

161. CCDR, or any warden or supervisor at a hyper-endemic prisons, could therefore at any time have initiated procedures to transfer at-risk inmates away from the high-risk facilities, and also could have suspended the transfer of any further at-risk inmates into hyper-endemic prisons.

162. The transfer procedure uses standardized forms and checklists for determining the eligibility and suitability for transfer of any inmate to any particular facility.[43]

163. These forms allow for easy analysis of an inmate's suitability for transfer to any given CCDR facility.

164. None of CCDR's classification forms included any provision for the assessment of an inmate's susceptibility to Valley Fever or his or her suitability for transfer to or away from hyper-endemic prisons.

165. Defendants failed to take even this elementary step to prevent exposure or to remove susceptible individuals from the danger.

---

[41] *See* §§ 3379(b), 3379(c).

[42] Title 15, § 3379(a)(4).

[43] See, e.g., CCDR Forms 839, 840, 841.

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

**V(e)**

**Susceptible Inmates Could Have Been Transferred
to Out-of-State Prison Facilities.**

166. CDCR maintains a separate office called the Contract Beds Unit (CBU) to administer the already-substantial volume of inmates CDCR transfers to out-of-state facilities.

167. The Governor's 2006 Proclamation, and subsequent passage of Assembly Bill (AB) 900, the Public Safety and Offender Rehabilitation Services Act of 2007, provided the authority for CDCR to transfer inmates to private prison facilities in other states.

168. CDCR began to transfer inmates to out-of-state facilities under this authority in October 2006.

169. Between 2006 and 2009, CDCR announced the transfer of thousands of inmates to out-of-state correctional facilities to relieve prison over-crowding.  CDCR put out numerous press releases celebrating its successes with out-of-state transfers during this time, including:

- *"Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer"* (10/04/06)

- *"CDCR Resumes Temporary Out of State Inmate Transfers"* (6/4/07)

- *"CDCR Continues Temporary Out of State Inmate Transfers"*  (7/20/07)

- *"CDCR Contracts for Additional Out of State Beds to Reduce Overcrowding"*  (10/05/07)

-  *"Moving Inmates Out-Of-State Reduces Prison Overcrowding"* (4/21/08); and

• *"CDCR Amends Contract to House More Inmates Outside of California"* (11/2/09).

170. Under existing regulatory procedures and contractual arrangements, the CDCR can place California inmates in one of four different out-of-state correctional facilities: two in Arizona, one in Oklahoma, and one in Mississippi.

171. These out-of-state facilities are capable of housing inmates with any security classification level, including higher-custody levels that are not eligible for low-security facilities.

172. CDCR has already arranged to house at these four out-of-state facilities over 10,000 inmates transferred out of California prisons.

173. In 2009, as part of the ongoing plan to reduce prison overcrowding, CDCR amended its existing agreement with the Corrections Corporation of America (CCA) to expand the capacity for transfers of inmates out of state. The 2009 addendum allowed CDCR to add an additional 2,336 out-of-state beds for California inmates, for a total of 10,468 beds.

174. Scott Kernan, CDCR Undersecretary for Operations, stated that, "[o]ur ability to place offenders out-of-state offers us much needed flexibility in placement of offenders that ultimately creates a safer environment for inmates, our staff and for the public."

175. CDCR's "ability to place offenders out-of-state" could just as easily have been utilized to transfer at-risk inmates away from the known dangers of Valley Fever at hyper-endemic prisons.

176. CDCR had existing mechanisms, procedures, and capacity to remove every at-risk inmate away from the known danger of contracting Valley Fever.

177. Although CDCR knew by no later than 2006 that inmates including African–Americans, Filipinos, and older inmates were at extreme risk of contracting Valley Fever at hyper-endemic prisons, CDCR never attempted to transfer these at-

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

risk inmates away from this known danger, and never modified its procedures to prevent additional high-risk inmates from being transferred in to and housed at these facilities.

178. Knowing of this acute danger, and knowing that inmates at hyper-endemic prisons were powerless to protect themselves from exposure to Valley Fever, Defendants chose instead to "post laminated signs" about the "signs and symptoms" of the disease in facility medical clinics and inmate housing units. *Plata*, *supra*. CCDR did nothing to divert or to remove these at-risk inmates from the facilities where they were in mortal danger.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

# VI.

# EXEMPLARY DAMAGES

179. Defendants have engaged in a pattern and practice pursuant to official policy since at least 2006 that has placed and kept Plaintiffs in situations of unreasonable risk of substantial personal harm.

180. Despite numerous, repeated and explicit warnings about the danger of Valley Fever at the hyper-endemic prisons, and especially the danger to those individuals  identified as high-risk for the disseminated disease, Defendants failed to take any of the reasonable and obvious steps needed to protect those in their charge.

181. Defendants took no action to mitigate Plaintiffs' exposure to VF at their prisons until 2011 when, after multiple court orders, they finally took the minimal action of applying a two-year sealant to the soil at PVSP.[44]

182. Not until March 2013 did Defendants test and later install minimal dust control devices – air filters and door sweeps – in some of the prison facilities.[45]

183. Defendants also posted some incomplete warning signs about the symptoms of Valley Fever and provided some educational materials and trainings to prison medical staff.[46]

184. Notably absent from the posted signs and much of the Defendants' educational materials were the critical facts that Valley Fever is incurable and can be fatal, and that certain individuals such as African-Americans, Filipinos or those with

---

[44] *See* Deborah Hysen Declaration, May 6, 2013, ¶ 3**.**

[45] *See* Hysen Declaration ¶¶ 4-5.

[46] *See*, e.g., Declaration of Michael Stainer, May 6, 2013 [Exhibits C, D and E].

immune-compromising conditions are at a higher risk of becoming seriously ill and dying from Valley Fever.[47]

185. Dr. Galgiani has stated: "In my opinion, the incidence of Valley Fever in [PVSP and ASP] is unacceptably high from a public health standpoint, and avoidable inmate deaths are occurring as a result."[48]

186. Defendants knew that Valley Fever has no cure and requires a lifetime of medical management, that inmates had died while in custody from Valley Fever, and that certain identifiable groups of people suffer the severe form of the disease at much higher rates, a scientific fact that is over (80) years old.[49]  Yet Defendants took no action other than posting some signs and distributing some leaflets, which downplayed or omitted the crucial information about risk groups, and more importantly, did nothing to address the causes or the results of the problem.

187. Defendants admitted in pleadings in *Plata* that they took no steps to mitigate the threat of harm posed to prisoners in the hyper-endemic prisons, apart from inadequate educational materials and an under-inclusive exclusion policy, between the years 2006 and 2011.[50]  This was even though Defendants, in their own words, were aware "that Valley Fever presents a serious risk to inmate health."[51]

---

[47] See, e.g., Stainer Declaration, Exhibits C, D and E.

[48] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 2.

[49] Kanan Memo, p. 3 ["The risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks, and immunocompromised individuals, including those taking chronic steroids."]; *see also*, CDCR October 27, 2006 Memo; Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), at p. 314, and fns. 5, 27.

[50] *See* Defendants' Opposition brief in *Plata*, May 6, 2013, Docket 2618, pp. 3-4.

[51] *Id.*, at pp. 13.

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

188. Defendants declined to increase ground cover plantings, as recommended by the California Department of Health, finding it too costly to implement, even though ground cover "was demonstrated to be effective at reducing airborne spores by military operations during World War II."[52]  Instead they waited until compelled by court order in 2011, and even then, deployed a minimally-effective soil sealant with only a two-year life span.[53]

189. The court-appointed experts in the *Plata* case found overall that Defendants' attempts to mitigate the threat of Valley Fever to Central Valley prisoners were "ineffective in mitigating the coccidioidomycosis crisis."[54]

190. Dr. Gil Chavez, California's State Epidemiologist and the Deputy Director of Infectious Diseases within California's Department of Public Health, opined that "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, such as African-Americans and persons with diabetes and other chronic diseases."[55]

191. In April 2012, the Receiver completed a study with several grim findings.  Because of Defendants' years-long pattern and practice of ignoring the known heightened risk of disease to certain groups of inmates, at least 355 prisoners required hospitalization because of Valley Fever from 2008-2010, and 27 prisoners lost their lives due to the disease between 2006 and 2010.[56]

---

[52] *Plata* order, June 24, 2013, Docket 2661, p. 5:18-23; *see also* Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California*," CDCR Memorandum June, 2007 [internal page 1, recommendation 1].

[53] *See* Deborah Hysen Declaration, ¶ 3.

[54] *Plata* Order, June 24, 2013, p. 7:6 [Docket 2661].

[55] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, p. 1, ¶ 2.

[56] *See* "*Coccidioidomycosis in California Department of Corrections and*

192. The rate of deaths due to cocci among African-American inmates was eight times the death rate among African-Americans in California generally, and twice the death rate due to cocci among non-African-American inmates in California.[57]

193. The court-appointed Receiver managing the California State prison system's health care program issued his "*Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons*" in November 2012.[58]   Included among the Receiver's recommendations, formed in consultation with court-appointed medical experts, was the direction to cease transferring African-Americans, persons with diabetes and those with no HIV test results to PVSP and ASP.[59]

194. On April 11, 2013, the Receiver's public health staff presented him with an analysis and report concerning the Valley Fever epidemic in the PVSP and ASP facilities.[60]   This report found that African-Americans were at 90% increased risk for disseminated cocci disease than their fellow white inmates, and "other race" categories (e.g., perhaps Asian, Native-American) were at 100% increased risk; inmates over 55 years old bore an increased risk by 60%.  Ibid.

195. With such analyses in hand, the Receiver still had to issue yet another directive to the defiant CDCR on April 29, 2013, amended on May 1, 2013, as the

---

*Rehabilitation Institutions,"* CCHCS Report, October 10, 2012, p. 2.

[57] Id., pp. 5-6 ["For the year 2006-2007, African-American inmates were eight times more likely … to die of coccidioidomycosis than African-American men in the California population"].

[58] *Plata* order, June 24, 2013, p. 9 [Docket 2661].

[59] *Id*.

[60] Kelso, "Notice Of Filing Of Report And Response Of Receiver Regarding Plaintiffs' Motion Re Valley Fever," *Plata v. Brown*, Eastern District California No. 01-1351 [May 1, 2013, Docket 2601].

Defendants continued to refuse to exclude from the endemic-area prisons inmates with clearly-identified high-risk attributes, including African-Americans, persons with diabetes and those with no HIV test results.[61]

196. In their May 23, 2103 report, the medical experts appointed by the District Court in the *Plata* case found that 36 inmate deaths were caused by Valley Fever between 2006 and 2011.  Of those deaths, 70% were African-American and 76% had a concurrent immune-compromised condition such as HIV or diabetes.[62]

197. Those same medical experts underscored the importance of excluding from PVSP and ASP "all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease (e.g., African-Americans, Filipinos) … [as well as] individuals whose HIV status is unknown[.]" [63] They also concluded that, "if measures taken do not reduce cocci rates to near local community rates, [CDCR] should close PVSP and ASP."

198. Despite the Receiver's specific instructions and the court-appointed medical experts' opinions, for reasons known only to Defendants "CDCR has continued to refuse to exclude the other inmates covered by the Receiver's policy – most notably, diabetics and African-American and Filipino inmates[.]"[64]

199. Defendants continued to defy the Receiver's explicit instructions, complaining that the policy was "vague" and "premature."[65]

---

[61] *See* Kelso Report, pp. 9-11.

[62] *See* Plata v. Brown, ED 01-1351 [Judge Henderson Order, citing Court Medical Expert Report, "Cocci. in California State Prisons," p. 5 [Docket 2661, "Henderson Order"].

[63] Henderson Order, p. 12 [Docket 2661].

[64] Henderson Order, citing Court Medical Expert Report, "Cocci. in California State Prisons," p. 11.

[65] Declaration of Diana Toche, May 6, 2013, ¶¶ 11-14 [Docket 2615]; Declaration of Warren George, pp. 5-6 [email thread with relevant commentary by Deputy Attorney

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

200. According to Dr. Galgiani, "[t]he incidence of Valley Fever at these two prisons is at a level indicating a public health emergency. … The problems posed by [Valley Fever] in these two prisons present a public health emergency, and prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk."[66]

201. Galgiani concluded that, as a result of the California prison system's inadequate handling of the Valley Fever epidemic among inmates, "needless suffering and death were inflicted on these men."[67]

202. In spite of the repeated warnings, urgings and expert-informed directives, Defendants continued to send prisoners to facilities located in the endemic and hyper-endemic areas, including those in the well-known high-risk categories.[68]

203. The *Plata* Court found that: "The experts [all] agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response. … Defendants are unwilling to exclude [certain] inmates whom they know are at an increased risk of severe disease, which may lead to death. Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population[.] … In the absence of a court-ordered exclusionary policy, inmates will continue to suffer unnecessary and unreasonable harm, thus presenting the most

General Benjamin Rice dated May 3, 2013]; May 8, 2013 letter from Dr. Diana Toche to J. Clark Kelso.

[66] Galgiani Declaration, ¶ 15.

[67] Galgiani Declaration, ¶ 19.

[68] See, e.g., Dovey "*Inmate Patients at High Risk,*" [CDCR Memo August 3, 2006]; Hubbard & Winslow, "*Exclusion of Inmate-Patients* [CDCR Memo November 20, 2007]; *Plata* order, p. 5, June 24, 2013, Docket ["Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out."]

recent example of how Defendants lack 'the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services.... .'[69]

204.  The *Plata* Court noted that "the recommendation to exclude inmates at higher risk of severe cocci was first specifically made to Defendants over *six years ago*."[70]

205.  The Supreme Court has made it clear that "[i]f government fails to fulfill its obligation [to provide care consistent with the Eighth Amendment], the courts have a responsibility to remedy the resulting Eighth Amendment violation."[71]

206.  Defendants' deliberate failure to take any action to protect Plaintiffs, who were known to be at higher risk of contracting the severe, disseminated form of Valley Fever, in the face of a duty to act, constituted a reckless indifference to Plaintiffs' 8th Amendment rights.

207.  For all the reasons stated herein, Defendants' indifference to Plaintiffs' suffering has been willful and with conscious disregard of the rights or safety of others within the meaning of California Civil Code section 3294, subdivision (c)(1).[72]

208.  Plaintiffs, permanently harmed by Defendants' decisions and conduct, deserve not simply compensation for the injuries and losses inflicted at Defendants' hands, but to receive in addition punitive damages as allowed by law, to mark and deter the type of human rights violations described in this action.

---

[69] *Plata* order, p. 24 [Northern District Judge Thelton Henderson, filed June 24, 2013, Docket 2661].

[70] *Plata* order, p. 20 [emphasis added].

[71] *Brown v. Plata*, 563 U.S. __ , 131 S.Ct. 1910 (2011).

[72] *See Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005); *Morgan v. Woessner,* 997 F.2d 1244, 1255 (9th Cir. 1993) for similar standards governing 1983 actions.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

# VII.  PLAINTIFFS

## DION BARNETT

210. Dion Barnett is a 36-year-old African American male from Chicago who grew up in Oxnard.  He is interested in philosophy and worked in sales most of his career.

211. He was convicted of possession of a controlled substance and resisting arrest. He was paroled in June 2013.

212. He was transferred to PVSP in September 2010.  He understood he was supposed to go to Lancaster or Donovan and was not told why he was instead sent to PVSP.  He remained there until December 2012 when he was transferred to Mule Creek.

213. Before his transfer to PVSP, Barnett suffered from asthma and high blood pressure. Because of his concern about being housed at PVSP, he asked to be tested early for the fever and the results were negative. He became ill in late December 2011 with trouble breathing and fluid in his lungs. He was formally diagnosed with Valley Fever in April 2012.

214. He first noticed physical problems on December 28, 2011.  He began to experience night sweats, aches in the joints and muscles, problems breathing, headaches, and rashes. Currently, he cannot exert himself physically without feeling winded. At times, his physical pain is so acute, he cannot get out of bed. He believes his lungs are permanently compromised and he will suffer painful ailments forever.

215. He was prescribed fluconazole and morphine, later replaced with indomethocine, for his pain.  His condition continued to worsen and he asked for a stronger dosage or a stronger medication but was denied repeatedly.

216. Physicians have informed Barnett he will likely have long term problems with his left lung, joint and back problems, low energy and shortness of breath when attempting to exert himself.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

217. Barnett knew when he was transferred to PVSP that he was in a high risk category. He requested a transfer before he was diagnosed with VF and was denied even though he was at high risk. No preventative measures were taken by the prison to protect him. Barnett was denied a transfer at all levels on grounds that he did not meet the criteria for transfer.

218. Barnett admits his mistakes and believes he has paid his debt to society but should not have had to contract Valley Fever as an additional sentence. He is of limited means and cannot afford to purchase the medication he requires. He does not know how he will get treatment or survive for long without medical care.

219. Prior to Barnett's 2010 transfer, Defendants Cate, Hubbard Igbinosa, Kelso, Schwarzenegger, Rothchild, Winslow and Yates were all in a position to prevent Barnett from being transferred to or accepted at PVSP. All knew that African-Americans and persons with respiratory health complications were particularly susceptible to Valley Fever, yet they failed to act to prevent Barnett from being housed at PVSP. Around the time of Barnett's 2010 transfer to PVSP, Barnett protested his placement to PVSP and requested a transfer out, but on information and belief, Defendants Brazelton, Igbinosa and/or other presently unknown prison officials, aware that he was African-American and aware that he had a level of respiratory compromise, ignored or denied his requests, thus evidencing deliberate indifference to his serious health needs.

## PLAINTIFF DANNY DALLAS

220. Danny Dallas is a 54-year-old African-American male from Modesto, California who is not currently incarcerated.  He was released from custody on June 11, 2013.

221. Mr. Dallas was transferred from Soledad State Prison to PVSP on April 18, 2010.  He contracted Valley Fever sometime between November and December of 2012.  On December 2, 2012 he became ill with chest pains, unspecified bodily pain, severe coughing with sputum, a temperature of 103-104, and a rapid loss of 25-30 pounds.  He was hospitalized. Blood tests and x-rays confirmed a diagnosis of Valley Fever along with a case of pneumonia.

222. He began a medicine regime (Azithromycin 250mg) for the Valley Fever and the pneumonia from December 10, 2012 through December 15, 2012.

223. On December 21, 2012, he was rushed to the San Joaquin Community Hospital in Bakersfield, California; he was admitted and remained there until December 27, 2012.  While in the hospital he was prescribed (Diflucan) medication, however, the medicine proved too strong for his liver, and he was given (Itraconazole100 mg).

224. On December 27, 2012, he was transported back to the prison infirmary where he remained until January 8, 2012.  He continues to take Itraconazole, and was informed that he would have to take the medication for the rest of his life.

225. After release from the infirmary he says he has suffered intermittent severe joint pain and was prescribed Ibuprofen (600mg).  Additionally, he was prescribed Benzonatate (100mg) for a persistent cough with sputum.

226. On February 3, 2013 he filed his first health care (602) complaint. The complaint was cancelled and return to him on February 14, 2013 because he supposedly made a mistake by requesting an injunction order on the prison inmates placed in harm's way from exposure to Valley Fever.  He sent a second HC (602)

complaint on March 3, 2013 leaving out the injunction order and indicating only his personal disagreement which at the time was at the first level on April 19, 2013.

227. On April 2, 2013, Mr. Dallas re-submitted his appeal of the cancellation (CCR 3084.6(e)) but before he received a response he went to court on April 19, 2013 for re-sentencing to credit-for-time-served because the law pursuant to Proposition 36 reduced his Three Strikes sentence.  He returned on April 22, 2013 hoping for a response for his Valley Fever (602) complaint filed on the first level, but did not receive one.

228.  In 2013, Mr. Dallas requested to be sent back to a level two state prison, but was endorsed to remain at Pleasant Valley despite these requests to be transferred.

229. Because Mr. Dallas is now out of custody, an administrative exhaustion requirement no longer applies.

230. Mr. Dallas has had chronic medical issues (lower back pain and problems relating to his bowels), dating back to a 1976 attempted murder on his life (a life threatening stabbing injury).  His strength and bodily functions have weakened since contracting Valley Fever and his chronic ailments are exacerbated by the ailment.  Before his arrival at PVSP his immune system was not comprised.

231. As of June 6, 2013, Mr. Dallas suffers physically with severe joint pain; inflammation in his legs and feet; coughing with sputum; and other ailments relating to the Valley Fever.  He has been repeatedly informed by doctors that he will suffer from this illness for the rest of his life.

232. Mr. Dallas suffers chronic stress and anxiety due to the fear that Valley Fever is going to cause his death.   He believes that CDCR officials were aware of the harmful and potentially deadly threat for years to the inmates housed a PVSP, but consciously ignored the seriousness of the illness and did nothing to protect the inmates.

233. Prior to Dallas's 2010 transfer, Defendants Cate, Hubbard, Igbinosa, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates and were all in a position to

prevent Dallas from being transferred to or accepted at PVSP. All knew that African-Americans were particularly susceptible to Valley Fever, yet they failed to act to prevent Dallas from being housed at PVSP.

234. After the time of Dallas' 2010 transfer to PVSP, Dallas requested transfer out of PVSP at each of his annual classifications, but on information and belief, Defendants Brazelton, Igbinosa and/or other presently unknown prison officials, aware that he was African-American, ignored or denied his requests, thus evidencing deliberate indifference to his serious health needs.

**PLAINTIFF CHRISTOPHER GARNER**

235. Mr. Garner is 38-years-old, part African American, part Asian. He grew up in Los Angeles and comes from a hard-working middle class family. He graduated from high school, received an Associates of Arts degree from a junior college and was working on his 4 year degree in graphic arts/design.

236. Garner was transferred to PVSP in May 2010 because he was a level 3 inmate.

237. He made the mistake of acting as the getaway driver during a robbery gone wrong.  He was sentenced under the felony murder rule, as a person got killed while he waited in a car.

238. Before transfer to PVSP, Garner enjoyed excellent health and did not take any medications. He could perform many exercises and take part in many physical activities. He was formally diagnosed with Valley Fever in August 2011 after repeated requests for transfer. Garner believes he contracted the disease from breathing in the fungus while housed at the prison. Prison officials did not take preventative/minimizing measures as there were supposed to do.  He is afraid to exercise outside for fear of a reoccurrence of the disease.

239. He first noticed symptoms around mid-July of 2011.  He began to experience severe coughing that was so bad that he was coughing up a mucus-like substance.  He also experienced pain in his chest and joints, muscle pain all over, weakness, migraine headaches, chills and sweats, shortness of breath, dizziness, choking and exhaustion.

240. Garner was prescribed Fluconazole, at first 4 pills per day, and then reduced to 2 pills per day.  He was also prescribed Ibuprofen and Keflex for pain and Calamine lotion for skin sores (a side effect of Fluconazole). He had x-rays taken of his lungs because of his shortness of breath and of his joints and knees because of the pain.  More recently, he has had eye complications and went to see an optometrist.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

241. The disease has spread into his joints and bones and other body organs. He has sharp pains on his left side under the ribs and has begun to have trouble with his eyesight.  He is fearful of eventually suffering partial or total blindness.

242. Prison officials knew that Garner was in a high risk group.  Fearful of catching the disease, Garner applied for transfer under the 602 procedure within two weeks of his arrival but was denied. Mr. Garner requested but was denied transfer away from the hyper-endemic area twice before contracting the disease. The remaining levels of appeal were denied on grounds that Garner did not meet the CDCR's high risk criteria for transfer.

243. Prior to Garner's transfer, Defendants Cate, Hubbard, Igbinosa, Kelso, Rothchild, Schwarzenegger, Winslow and Yates were all in a position to prevent Garner from being transferred to or accepted at PVSP. All knew that African-Americans were particularly susceptible to Valley Fever, yet they failed to act to prevent Garner from being housed at PVSP by adopting appropriate policies.

244. On information and belief, Defendant Rothchild and other classification service representatives knew the danger associated with PVSP, especially for persons such as Garner who was African-American, and knew that he should not be transferred to PVSP but transferred him there anyway pursuant to existing policy, knowing and disregarding the risk to his health. After Garner's 2010 transfer to PVSP, he continuously protested his placement at PVSP and requested to be transferred out, but on information and belief, Defendants Brazelton, Yates, Dr. Igbinosa and Dr. Ho, and potential defendants Captain Shannon, Lt. Dotson, PVSP Appeals Coordinators Nesbit, Martinez, Huckabay, Morgan, Foreman, Noel, Harton, CEO of Health Care A. Lonigro, Garner's transfer committee members Randle, Douthat, and Cano, and/or other presently unknown prison officials, aware that Garner was African-American, ignored or denied his requests, continued to expose him to risk and further medical damage by keeping him in a hyper-endemic exposure

and continuously exposing him to cocci, and thus evidencing deliberate indifference to his serious health needs.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

**PLAINTIFF RODNEY RAY ROBERTS**

245. Mr. Roberts is 30-year-old, part African American.  He was an exceptional athlete in football and basketball.

246. After suffering a conviction for second degree robbery, in 2010, Roberts was sent to Avenal State Prison, although he suffered from mild asthma and this was known to prison authorities.  Thus, Roberts was a "double" high risk in that he is African-American and suffers from a respiratory condition.

247. Since contracting the ailment, Roberts has experienced an almost constant state of fatigue, is only able to exercise on a limited basis, and is unable to play any types of sports.

248. He was prescribed 200 mg of fluconazole as treatment.

249. After giving Roberts the treatment for (6) months, they discontinued it. Subsequently, they retested Roberts for Valley Fever and the prison doctor informed Roberts that not only did he not have the disease, but that he never had it.

250. On May 3, 2013, Avenal medical personnel decided that Roberts was not at high risk for serious complications from Valley Fever and declined to transfer him out of the hyper-endemic area, even though continued exposure to adverse particulate matter in the respiratory system increases the health risk to the afflicted individual.

251. In Roberts' case, state officials claimed that "[i]ndividuals who had Valley Fever in the past are immune to new infections."  Reinfection or "reactivation" occurs whenever there is continued exposure to Coccidiodes spores and they overcome the body's immune system.

252. The prison system failed Mr. Roberts: (i) first, after the 2005-2006 epidemic event, which was a high profile event both inside and outside the prison system, transfers to Avenal should have stopped.  Defendants Cate, Hartley, Hubbard, Kelso, Rothchild, Schwarzenegger and Winslow were in a position to prevent Roberts' transfer to Avenal, but these Defendants continued or participated in the ongoing policy and continued to transfer inmates to Avenal, including Roberts.

253. Before Roberts' 2010 transfer, on information and belief, Defendants Cate, Hartley, Hubbard, Kelso, Rothchild, Schwarzenegger and Winslow actually knew that African-American inmates were particularly susceptible to the contraction of Valley Fever, yet they failed to act to prevent the transfer of African-Americans inlcuding Roberts to hyper-endemic prisons such as Avenal.

254. Before Roberts' 2010 transfer, on information and belief, Defendants Cate, Hartley, Hubbard, Kelso, Rothchild, Schwarzenegger and Winslow actually knew that persons with respiratory health complications, such as Roberts' case of asthma, placed an inmate at exceptional risk for Valley Fever, yet they failed to act to prevent Roberts' transfer to the hyper-endemic area by adopting appropriate policies consistent to address the risk.

255. On information and belief, Defendants Rothchild and other classification service representatives knew that persons such as Roberts, who was African-American and had asthma, should not be transferred to Avenal but they transferred him there anyway, knowing and disregarding the risk to his health. At or around the time of Roberts' transfer to Avenal, he protested his placement there and requested a transfer out to a potential defendant named Dr. Greenleaf based on his racial status and asthma condition, but on information and belief, Defendants Hartley and potential defendants Dr. Greenleaf and Dr. Boparai and/or other presently unknown prison officials at Avenal, aware that he was African-American and aware that he had a level of respiratory compromise, ignored or denied his requests, further exposed him to cocci, and thus evidenced deliberate indifference to his serious health needs.

**PLAINTIFF JEREMY ROMO**

256. Jeremy Romo is a 33-year-old Hispanic male from Hayward, California. He is a construction worker by trade. He is certified to work on category 5 electronics and fiber optics, and is trained in construction management. Before falling ill, his passion was working out and long-distance running.

257. Mr. Romo was convicted in 2012 of unlawful possession of a firearm. From July to November 2012, he was housed at C.C.I. Tehachapi, a prison within the zone of hyper-endemic prisons (per the Hubbard & Winslow November 20, 2007 internal state memorandum), and where the entire exercise yard is dirt. After he was diagnosed with Valley Fever, Mr. Romo was transferred to C.T.F. in Soledad. He has since been released from custody.

258. On August 26, 2012, Mr. Romo requested medical treatment. He was experiencing a severe headache, fever, sweating, aching muscles, unquenchable thirst, loss of appetite, fatigue, and shortness of breath. At the clinic, Christopher Sian, R.N., purported to treat Mr. Romo. Mr. Rian ridiculed Mr. Romo and told him there was nothing wrong with him and sent him back to housing after giving him a bottle of water to drink. On September 19, 2012, Mr. Romo was hospitalized at San Joaquin Hospital in Bakersfield with pneumonia and Valley Fever in his left lung.

259. Mr. Romo filed a 602 against Mr. Rian because Mr. Rian was indifferent and cruel in his "treatment." Though he received no response, Mr. Romo was soon transferred to Soledad, where he served out the remainder of his sentence.

260. Mr. Romo still suffers from disseminated Valley Fever. He has skin lesions on his legs and feet. His lung is scarred; he is easily fatigued and short of breath and is generally lethargic, whereas before he was energetic and strong. He is depressed and experiences night sweats. He feels a constant and debilitating pain in his joints and he has scarring in the anterior segment of the left upper lobe of his lung associated with an 11 mm nodule.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

261. To treat his condition Mr. Romo takes 800 mg of Fluconazole daily for the infection. He also takes 10mg of methadone three times a day for the pain. In addition to this medication he requires monthly chest x-rays and blood tests, and a CT scan every three months.

262. Mr. Romo is unable to afford this costly medical care now that he is out of custody. He is unable to work in his trade because he has no strength and is easily winded.

263. The exercise yard at Tehachapi is bare dirt and therefore prone to spreading the dangerous spores. Inmates were not given dust masks.

264. After the epidemic but before Romo's 2012 transfer to CCI Tehachapi, Defendants Brown, Cate, Hartley, Kelso, and Rothchild were all in a position to change the policy toward transferring inmates to hyper-endemic prisons, yet these Defendants participated in the ongoing policy to keep transferring inmates to these dangerous places.

265. After the epidemic but before Romo's 2012 transfer, and on information and belief, Defendants Brown, Cate, Hubbard, Kelso, Rothchild and Winslow (or the then current classification services unit chief) actually knew that Hispanic inmates were more susceptible to the contraction of Valley Fever than regular persons, which made it a constitutional violation to needlessly expose them to it, yet they failed to act to prevent the violation by changing existing policy to exclude transfer of Mexican-Americans such as Romo to hyper-endemic prisons.

266. After the epidemic but before Romo's 2012 transfer, and on information and belief, Defendants Rothchild and/or other classification service representatives, Warden Hartley as well as other prison officials at Avenal knew the danger associated with hyper-endemic prisons and Valley Fever, especially for Hispanic persons such as Romo, should not be transferred to CCI but they transferred him there anyway.

267. After the 2006 epidemic and after the time of Romo's 2012 transfer to CCI, Romo, without knowing of any health danger relating to Valley Fever, spent at times (5) hours per day working out on the all-dirt exercise yard at Avenal, and yet defendants Beard, Brown, Hartley Hysen, Kelso, and Rothchild, and/or other unknown prison authorities physical located at Avenal, failed to pass any policies, practices or systematically circulate warnings for Romo to avoid the dirt, avoid dusty conditions on the yard, and otherwise take appropriate measures to minimize exposure to soil-based spores, thus evidencing deliberate indifference to his serious health needs.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

**PLAINTIFF COREY LAMAR SMITH**

268. Mr. Smith is a 37-year-old African American raised in a loving, religious family.  He graduated from high school and seeks to become a counselor to help people through life.  He has a record based primarily on petty burglaries.

269. He is currently incarcerated based on a burglary charge and is evidently not set to parole until 2032, despite a spirited debate (which Smith lost) about whether the Three Strikes Law was truly intended to cover criminal recidivism of his gravity.

270. Before transfer to PVSP, Lamar suffered from asthma but was otherwise in good health. He was diagnosed with Valley Fever in December 2011.

271. Smith began to suffer pain in his joints and chest, night sweats, uncontrollable coughing and loss of appetite. He also developed pneumonia and skin rashes.  Because of the pain, Smith can no longer exercise like he used to. His system can no longer fight off common colds except with great difficulty.

272. Lamar has received intermittent treatment for Valley Fever.  He was given Fluconazole (4 pills a day), but when he tried to refill his prescription he was informed that it was discontinued and/or his medical chart could not be found.  He had x-rays taken because of his shortness of breath.  He began physical therapy for his joint pain but stopped because of the lack of improvement and increased pain. Ibuprofen was prescribed for body aches.

273. Defendants transferred Smith to PVSP and allowed his transfer knowing he suffered from asthma and as an African American was at high risk for developing the disseminated form of the disease.

274. Prison officials knew that Smith was African-American, and on information and belief also knew that he had asthma, and as such, he was in a group at high risk for contraction of the disseminated form of the disease.  Smith requested a transfer but was denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

275. Prior to Smith's transfer, Defendants Cate, Hubbard, Hysen, Igbinosa, Kelso, Rothchild, Schwarzenegger, Winslow and Yates were all in a position to prevent him from being transferred to or accepted at PVSP. All knew that African-Americans were particularly susceptible to Valley Fever, yet they failed to act to prevent this at-risk prisoner of his risk level from being housed at PVSP.

276. On information and belief, Defendant Rothchild and other classification service representatives knew the danger associated with PVSP, especially for persons such as Smith who was African-American and had asthma, and knew that he should not be transferred to PVSP but transferred him there anyway pursuant to existing policy, knowing and disregarding the risk to his health. After Smith's 2009 transfer to PVSP, he protested his placement and requested to be transferred out, but on information and belief, Defendant Yates and/or other prison officials, aware that Smith was African-American and aware of the exceptional risk to his health, ignored or denied his requests, continued to expose him to cocci spores and caused him further medical damage thus evidencing deliberate indifference to his serious health needs.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

# VIII.

## PLAINTIFFS' FIRST CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT
## (42 U.S.C. § 1983)

## <u>COUNT 1</u>

### (Policies and Practices of Unconstitutional Transfer to Dangerous Area)
### (Brought Against the Prison Leadership in Their
### Personal, Supervisory Capacity)

277. Plaintiffs incorporate the allegations of paragraphs 1-275, as if these allegations were fully set forth herein..

278. Each plaintiff is a human being.

279. Each plaintiff had an Eighth Amendment federally-protected right to be free from cruel and unusual punishment, a right secured by the United States Constitution, under 42 U.S.C. § 1983.

280. Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described herein under the authority of California statute, regulation, and policy, to control Plaintiffs' lives, prison housing location and prison housing conditions.

281. The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.[73]

282. When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a responsibility for his safety and general well-being.[74]When the State fails to provide for the needs of a confined individual, including medical care and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

---

[73] *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir.2006).

[74] *Helling* v. *McKinney*, 509 U.S. 25, 32 (1993); *DeShaney* v. *Winnebago*, 489 U.S. 189, 199-200 (1989).

283.    An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.[75]

284.    It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm.[76]

285.    Defendants knew of the dangers of Valley Fever, as set forth in detail above.

286.    Defendants knew there was a serious, epidemic level of risk of harm to Plaintiffs, and all prisoners that faced incarceration in hyper-endemic prisons, particularly Pleasant Valley.

287.    Defendants had actual knowledge of the serious risk of harm to the Plaintiffs but nevertheless ignored the risks and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Coccidioidomycosis by employing an exclusion policy that under-assessed the number of high risk inmates.

288.    Defendants' narrow exclusion policy and subsequent practice of transferring and incarcerating vast numbers of inmates, including Plaintiffs, to hyper-endemic prisons, and especially PVSP, caused their medical injury.

---

[75] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

[76] *Helling v. McKinney*, 509 U.S. 25 (1993) [finding inmate stated an Eighth Amendment claim for exposure to second hand smoke]; *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1054-55 (8th Cir. 1989) [holding a prisoner had an Eighth Amendment claim when he alleged that pesticides were sprayed into housing units so that prisoners had to breathe the fumes]; *Cody v. Hillard*, 599 F.Supp. 1025, 1032 (D.S.D. 1984) (finding inadequate ventilation of toxic fumes in inmate workplaces was unconstitutional), *aff'd in part and rev'd in part on other grounds,* 830 F.2d 912 (8th Cir. 1987) (en banc); *Murphy v. Wheaton*, 381 F.Supp. 1252, 1261 (N.D. Ill. 1974) [finding an Eighth Amendment claim where inmates were exposed to noxious smoke fumes created by other inmates burning blankets]; *Herman v. Holiday*, 238 F.3d 660 (5th Cir. 2001) [exposure to enough asbestos to cause an unreasonable risk of serious harm violates the Eighth Amendment]; *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir. 1990).

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

289.    Defendants unlawful exclusion policy created this unacceptably high risk, given the high rate of disease.  Defendants are subsequently liable for these unconstitutional policies and practices because they personally participated in the promulgation, adoption, passage, or continuation of them.

290.    Through the policies and practices they adopted, promulgated, followed, and/or executed, Defendants knew or reasonably should have known that they would cause the unconstitutional deprivation of Plaintiffs rights.

291.    Specifically, under these policies and practices, subordinate officials did not transfer inmates away from the most dangerous prisons, they did not identify inmates at high risk in the classification process, and consequently, they continued sending inmates including Plaintiffs to endemic and hyper-endemic prisons without regard to susceptibility or risk.  Furthermore, Defendants did not authorize or fund measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems, or even warning inmates about the various dangers they faced.

292.    Defendants, as supervisors of the rank-and-file prison members, knew with substantial certainty that these oversights would cause inmates including Plaintiffs to contract Valley Fever, and that their failure to properly train and supervise subordinate prison authorities would cause the deprivation of Plaintiffs' right to medical safety under the Eighth Amendment.

293.    Defendants, as supervisors, did nothing of consequence to prevent subordinate or rank-and-file prison authorities from minimizing Plaintiffs' exposure to Valley Fever.[77]

294.    Defendants have engaged in a pattern and practice of conduct since at least 2006 which they actually knew would place and keep California prison inmates housed at locations of unreasonable risk for personal injury.

_____

[77] *See Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir.2011).

295.   Despite numerous, repeated and explicit warnings about the serious danger of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease, Defendants failed to take the reasonable, obvious steps needed to protect those involuntarily in their charge.

296.   Defendants continued their practice and policy to transfer and house inmates in the hyper-endemic prisons, including those individuals known by them to be at heightened risk for contracting disseminated cocci disease, and as a result, caused Plaintiffs to contract a disease that is incurable, inflicts long-term suffering, and will likely play a part in the inmates' early death.

297.   Defendants possess, or possessed, an unlawful policy or practice of transferring inmates to unreasonably dangerous prisons without regard to their health.

298.   Defendants possess, or possessed, an unlawful practice and policy by failing to take any steps to protect inmates transferred to hyper-endemic prisons.

299.   Defendants possess, or possessed, an unlawful practice and policy by failing to employ mitigation measures at the dangerous prisons, such as paving, landscaping or planting grass to minimize the spread of the spores, or implementing appropriate measures with respect to ventilation systems to prevent spores from entering the interior of the facilities.

300.   Defendants possess, or possessed an unlawful practice and policy by failing to warn inmates about the dangers of prisons they were involuntarily and forcibly transferred to.

301.   The actions taken against Plaintiffs, whether they be a transfer of the above types to a dangerous prison, failure to warn the inmates about the dangers within prisons inside the hyper-endemic area, and/or failure to protect the inmates from the dangers within those prisons, particularly Pleasant Valley State Prison, were taken by

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

the defendant actors pursuant to the State's practice and policy, which they personally participated in adopting, promulgating, executing or continuing.[78]

302.   Those practices and policies caused Plaintiffs' harm[79]

303.   Defendants had the right, obligation and/or power to make policies, and implement practices, that would have minimized the risk of infection by Valley Fever.

304.   Defendants acted with a conscious disregard for human life in deciding to transfer prisoners to endemic and/or hyper-endemic areas and defied the many recommendations, input, advice, reports, expert suggestions, in-house studies, outside reports, generally-available academic material, as well as other credible and authoritative information sources that warned them of the dire risks and consequences they imposed on Plaintiffs by their inaction with respect to the spread of cocci.

305.   Defendants' conduct was purposeful, willful, deliberate, and inhumane, and warrants an award of exemplary damages so as to punish Defendants for their wrongful acts and to deter future misconduct.

---

[78] *See Osu Student Alliance* v. *Ray*, 699 F.3d 1053, 1070-1071 (9th Cir. 2012).

[79] *See Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978), *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), and *Rizzo v. Goode*, 423 U.S. 362, 371 (1976) [causation].

## VIII(a)

## Qualified Immunity

306.   Defendants were subjectively aware of a serious risk of harm from coccidioidomycosis, but deliberately elected to expose Plaintiffs to that risk even though the risk could have been avoided.

307.   Defendants deliberately violated the Eighth Amendment's prohibition against cruel and unusual punishment, and are accordingly denied the protection of qualified immunity.[80]

308.   For qualified immunity purposes, exposure to adverse environmental toxins is a well-established risk under the state's obligation to keep inmates safe.[81]

309.   Defendants knew that they were exposing Plaintiffs to a life-threatening, permanent ailment and that alternatives and protective measures were available.  They ignored these risks and they took no action.  Therefore, Defendants are not entitled to qualified or any other immunity.

---

[80] *Saucier v. Katz,* 533 U.S. 194, 201 (2000); *see Ramirez v. City of Buena Park,* 560 F.3d 1012, 1019-20 (9th Cir. 2009).

[81] "That the Eighth Amendment protects against future harm to inmates is not a novel proposition.  The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling*, at 33-35, citing *Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982); *see also, e.g., Rhodes v. Chapman*, 452 U.S. 337, 352, n. 17 (1981), *citing Gates v. Collier*, 501 F.2d 1291 (5th Cir.1974) [inmates were entitled to relief under the Eighth Amendment when exposed to hazardous electrical wiring, deficient firefighting measures, and the threat of serious contagious diseases]; *Hutto v. Finney,* 437 U.S. 678 [the Eighth Amendment prohibits exposure to toxic or similar substances even though the effects of exposure might not be manifested for some time].

BURNS | ELLIOT | PAVONE | SPIESS | ZUCKER

## PLAINTIFFS' FIRST CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT
## (42 U.S.C. § 1983)

### COUNT 2

### (Deliberate Indifference to Inmate Health)

### (Brought Against the Prison Medical Leadership in Their Personal, Supervisory Capacity)

310. Plaintiffs incorporate the allegations of paragraphs 1-312 as if these allegations were fully set forth herein.

311. Plaintiffs faced a substantial risk of serious harm, from their forced presence at the endemic or hyper-endemic prisons.

312.  Because of this, Plaintiffs experienced unnecessary and wanton infliction of pain and a lifelong ailment, and the exposure was without penological justification, since there were multiple means and methods to have avoided this harm, such as by stopping transfers to hyper-endemic prisons, adapting the state's procedures to screen inmates for susceptibility to the fungus, reducing the risk at the dangerous prisons by various ameliorative means through better ground cover and vegetation, ventilation management, inmate management to environmental risks, and inmate awareness of those risks – none of which was done.[82]

313. Defendants were deliberately indifferent to the risk of Valley Fever and the subsequent medical need, but disregarded the risk, did not change their policies or practices, and failed to take reasonable mitigation measures to prevent its contraction by Plaintiffs, as follows.

314. Defendant Beard, upon assuming the top role of CDCR, made no specific changes to the unconstitutional policy and practice of sending inmates to the

---

[82] *See Estelle v. Gamble*, 429 U.S. 97, 104 (1981); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

hyper-endemic prisons, including at-risk inmates, until Governor Brown capitulated to a federal court order.

315. Defendant Brazelton watched as Valley Fever infected large portions of the prison population directly under his control at PVSP.

316. Defendant Brown continued the exclusion policy that resulted in excess numbers of inmates being transferred to hyper-endemic prisons, without consideration of race, under-inclusion with regard to medical immunity, and other risks, and declined to adapt any change to policies along these lines despite years of compelling studies and prominent medical advice.

317. Defendant Cate oversaw CDCR from 2008-2012, when most of the unconstitutional transfers and new infection cases occurred with no known involvement on his part to address, minimize or solve the problem.

318. Defendant Hubbard wrote the 2007 memo which failed to acknowledge (80) years of scientifically-accepted fact that African-Americans and Filipinos, at a minimum, were also an unacceptable risk for Valley Fever and thereby passed a seriously underinclusive exclusion policy.

319. Ms. Hysen failed to take any serious environmental mitigation measures as the person most responsible for the grounds relating to the hyper-endemic prisons and thus cost the State as much as $20M/year by failing to adopt these preventative oversights.

320. Dr. Igbinosa was keenly aware of all the medical risks attributable to Pleasant Valley's prison population, as he was experiencing it firsthand, yet he adopted no practices or policies to correct the epidemic incidence rates

321. Mr. Kelso did nothing of consequence to interrupt the adverse health consequences to prisoners in the hyper-endemic areas, despite having powerful rights to implement preventative health measures.

322. Ms. Rothchild transferred prisoners without regard to calculating risk, and adapting accordingly, in order to minimize the transfer of at-risk prisoners to places where they would contract the fever.

323. Governor Schwarzenegger was positively indifferent to the adverse health consequences accruing to the inmates, as reflected by the statements in the 2007 press conference, his stated intent to expand PVSP's capacity and decision to continue sending prisoners of all risk levels to the hyper-endemic prisons.

324. Defendant Winslow was co-author of the 2007 memorandum which was under-inclusive with respect to the pool of at-risk prisoners, despite knowing as a medical practitioner that Valley Fever was far riskier to a much larger group of people than the narrow medical cases he excluded.

325. Defendant James A. Yates was at Pleasant Valley from 2005-2012, at the beginning of the epidemic, to its spike, to the debate about what should be done, to all the medical, environmental and exclusion ideas that could have minimized the harm and to Plaintiffs' knowledge he did not adopt a known, single meaningful act to improve the problem.

326. Based on these allegations, and all of the allegations and detail previously set forth herein, all defendants displayed a constitutionally unacceptable level of deliberate indifference to Plaintiffs' serious health needs, both subjectively and objectively, in that each of them was personally aware of the gravity of the problem, and each of them was in a position of leadership – and had a corresponding obligation – to act in a beneficial manner about it within the federal requirement to provide prisoner a safe place to serve their time.

BURNS | ELLIOT | PAVONE| SPIESS | ZUCKER

## PLAINTIFFS' SECOND CLAIM FOR RELIEF

## COMPLAINT FOR CALIFORNIA STATE LAW

## PREMISES LIABILITY

### (California Government Code section 835 et seq.)

### (Brought Against the State of California)

327. Plaintiffs incorporate the allegations of paragraphs 1-326 as if these allegations were fully set forth herein.

328. Government Code section 835 provides in full: "[e]xcept as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

329. As to those Plaintiffs that timely filed a victim compensation claim, they were transferred to prisons that were on property that was in a dangerous condition by creating an excessive risk to exposure to cocci spores, which causes the disease coccidioidomycosis.

330. The State's transfer of Plaintiffs to these dangerous prisons was a substantial factor and proximate cause of Plaintiffs' contraction of Valley Fever.

331. The dangerous condition of the hyper-endemic prisons created a reasonably foreseeable risk of contraction of Coccidioidomycosis, given the many years of exposure, contraction, illness and death experienced by inmates transferred to these prisons.

332. Defendant public entities had actual notice of the dangerous conditions for many years, but continued to transfer inmates to the hyper-endemic prisons, and continue to transfer persons to these prisons today, despite the serious risk of contraction of Coccidioidomycosis.

333. Plaintiffs were damaged as indicated.

### PRAYER FOR RELIEF

*Wherefore*, Plaintiffs request for each claim the following:

(i)    economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $5,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated by the State to cost about $25,000 per hospitalization)[83] to cover the cost of severe illness brought upon by dissemination of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the disseminated injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii)    non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii)    punitive damages;

(iv)    reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e) at the maximum allowable rate by statute, and for appellate work if necessary at fair

---

[83] CDCR Report, "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions* (October 10, 2012), p. 5.

market rates, pursuant to *Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012) [Case No. 09-16113, filed July 17, 2013].

      (v)    costs of suit including the expense of experts;

      (vi)   interest; and

      (vii)  such other relief as the Court deems just and proper.


      Respectfully Submitted:


Date: October 28, 2013           LAW OFFICES OF
                                      BENJAMIN PAVONE, PC

                                      \s\Benjamin Pavone
                                      Benjamin Pavone, Esq.
                                      Attorneys for Plaintiffs

Date: October 28, 2013           AFFELD, GRIVAKES & ZUCKER, LLP

                                      \s\ Gregg Zucker
                                      Gregg Zucker, Esq.
                                      Attorneys for Plaintiffs

Date: October 28, 2013           BURNS, SCHALDENBRAND, AND RODRIGUEZ

                                      \s\ Edward Burns
                                      Edward Burns, Esq.
                                      Attorneys for Plaintiffs

Date: October 28, 2013           LAW OFFICES OF DAVID ELLIOT

                                      \s\ David Elliot
                                      David Elliot, Esq.
                                      Attorneys for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury.  U.S. Const., 7th Amd.

Date: October 28, 2013                    LAW OFFICES OF
                                          BENJAMIN PAVONE, PC

                                          \s\Benjamin Pavone
                                          Benjamin Pavone, Esq.
                                          Attorney for Plaintiffs

Date: October 28, 2013                    AFFELD, GRIVAKES & ZUCKER, LLP

                                          \s\ Gregg Zucker
                                          Gregg Zucker, Esq.
                                          Attorneys for Plaintiffs

Date: October 28, 2013                    BURNS, SCHALDENBRAND, AND RODRIGUEZ

                                          \s\ Edward Burns
                                          Edward Burns, Esq.
                                          Attorneys for Plaintiffs

Date: October 28, 2013                    LAW OFFICES OF DAVID ELLIOT

                                          \s\ David Elliot
                                          David Elliot, Esq.
                                          Attorneys for Plaintiffs