# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COREY LAMAR SMITH, et al., | Case No.  1:14-cv-00060-LJO-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTIONS TO DISMISS ON THE GROUNDS OF QUALIFIED IMMUNITY |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | (ECF Nos. 138-139, 140-141, 142, 154, 156, 158, 160, 161) |
| | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

Currently before the Court are two motions to dismiss filed by Defendants in this action. The Court heard oral arguments on April 29, 2015.  (ECF No. 162.)  Counsel Benjamin Pavone, David Elliott, and Gregg David Zucker appeared for Plaintiffs, and counsel Jon S. Allin and Michelle L. Angus appeared for Defendants Jeffrey Beard, Paul Brazelton, Matthew Cate, James Hartley, Susan Hubbard, Deborah Hysen, Scott Kernan, Chris Meyer, Tanya Rothchild, Teresa Schwartz, Arnold Schwarzenegger, and James Yates; counsel Kristina Doan Gruenberg appeared for Defendants Felix Igbinosa and Dwight Winslow.  Id.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the April 29, 2015 hearing, as well as the Court's file, the Court issues the following findings and recommendations.

/ / /

1

1

# I.

2

## PROCEDURAL HISTORY

3      Plaintiffs Corey Lamar Smith, Dion Barnett, Christopher Garner, Rodney Ray Roberts,

4   Jeremy Romo, and Danny Dallas ("Plaintiffs") filed a complaint in this action against Defendants

5   Arnold Schwarzenegger, Jeffrey A. Beard, Paul D. Brazelton, Matthew Cate, J. Clark Kelso,

6   James D. Hartley, Susan L. Hubbard, Deborah Hysen, Dr. Felix Igbinosa, Tanya Rothchild, State

7   of California, Dr. Dwight Winslow, James A. Yates, and Edmund G. Brown in the Sacramento

8   Division of the Eastern District of California on October 28, 2013.  (ECF No. 1.)  On January 16,

9   2014, this action was transferred to the Fresno Division of the Eastern District of California.

10  (ECF No. 7.)  On January 28, 2014 an order issued relating this action to Jackson et al. v. State of

11  California, et al., 1:13-cv-01055-LJO-SAB, a class action raising similar claims.  (ECF No. 15.)

12  On this same date, Plaintiffs filed a first amended complaint alleging reckless exposure to

13  dangerous conditions and deliberate indifference to serious medical needs in violation of the

14  Eighth Amendment and negligence under California law.  (ECF No. 14.)

15      On March 27, 2014, this action was related to Beagle et al. v. Schwarzenegger, et al.,

16  1:14-cv-00430-LJO-SAB, a similar multi-Plaintiff action.  Beagle et al. v. Schwarzenegger, et al.,

17  1:14-cv-00430-LJO-SAB at ECF No. 14.  Defendants filed a motion to dismiss on May 5, 2014.

18  (ECF Nos. 37-40.)  The Court issued an order to show cause why the related actions should not

19  be consolidated.  (ECF No. 42.)  Defendant Clark Kelso was dismissed from the action due to

20  Plaintiffs' notice of voluntary dismissal on May 22, 2014.  (ECF No. 49.)

21      On May 29, 2014, Plaintiffs filed a notice that Abukar v. Schwarzenegger, 2:14-cv-01137-

22  TLN-KJN was a related case (subsequently transferred to this district and assigned case no. 1:14-

23  cv-00816-LJO-SAB).   (ECF No. 54.)   On June 24, 2014, this Court issued findings and

24  recommendations that were adopted in part on July 30, 2014; and Plaintiffs were ordered to file

25  an amended complaint.  (ECF Nos. 70, 80.)  On August 17, 2014, Plaintiffs filed a notice that

26  Adams v. Schwarzenegger, 1:14-cv01226-LJO-SAB was a related case.  (ECF No. 81.)   On

27  August 18, 2014, an order issued consolidating Smith, Beagle, Abukar, and Adams and ordering

28  Plaintiffs to file a consolidated complaint.  (ECF No. 82.)

On November 14, 2014, Plaintiffs filed a consolidated complaint.  (ECF No. 113.)  On February 6, 2015, Defendants Beard, Brazelton, Cate, Hartley, Hubbard, Hysen, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Yates filed a motion for summary judgment and request for judicial notice.  (ECF Nos. 138-139.)  On this same date, Defendants Igbinosa and Winslow filed a motion to dismiss, request for judicial notice, and joinder in the motion to dismiss.  (ECF Nos. 140-142.)  On April 15, 2015, Plaintiffs filed two oppositions to the motion to dismiss and objections to Defendants' request for judicial notice.  (ECF Nos. 154-156.)  On April 21, 2015, Defendants Igbinosa and Winslow filed a reply to Plaintiffs opposition.  (ECF No. 158)  On April 22, 2015, Defendants Beard, Brazelton, Cate, Hartley, Hubbard, Hysen, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger and Yates filed a reply to Plaintiffs' opposition and a response to Plaintiffs' objections.  (ECF No. 160, 161.)

There have been notices of related cases filed for Morrow v. Schwarznegger, 1:14-cv-01395; Hill v. Yates, 1:13-cv-01618; Wright v. Yates, 1:13-cv-01822; Chaney v. Beard, 1:14-cv-00369; Campbell v. Schwarzenegger, 1: 14-cv-1559; Lewis v. Schwarzenegger, 1:14-cv-0697; Blue v. Schwarzenegger, 1:14-cv-01074; Gregg v. California Dep't of Corrections, 2:09-cv-02561; Bates v. Schwarzenegger, 1:14-cv-02085; Robertson v. Stainer, 1:14-cv-00364; Morales v. Brown, 1:14-cv-01717; Chavarria v. Brown, 1:15-cv-00223.; and Altamirano v. Schwarzenegger, 1:15-cv-00607.  Some of these actions have been consolidated into this action, some have been merely related, some are stayed pending decision on Defendants' motions to dismiss, and some have yet to be addressed.[1]

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A complaint must contain "a short and plain statement of the claim showing that the pleader is

---

[1] On May 1, 2015, Plaintiff Josh Thomas filed a motion to represent himself in this action due to counsel informing him that he had to find a new attorney due to where he was housed when he contracted Valley Fever.  The Court will address this motion and any other similar motions filed in this action after Judge O'Neill issues his order on this motion.

entitled to relief." Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.

In deciding whether a complaint states a claim, the Ninth Circuit has found that two principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief.  Starr, 652 F.3d at 1216.

**III.**

**ALLEGATIONS IN CONSOLIDATED COMPLAINT**

Plaintiffs in this action are 159 current and former inmates of the California Department of Corrections and Rehabilitation ("CDCR") who have contracted Valley Fever.  (Consolidated Compl. at ¶¶ 9, 184-2081, ECF No. 113.)  Plaintiffs allege that the named defendants in this action knew that placing inmates in prisons where Valley Fever spores were prevalent posed an unacceptable risk of harm yet they continued to place inmates in these prisons and did not take measures to protect Plaintiffs from Valley Fever.  (Id. at ¶ 10.)  Plaintiffs bring this action against Pleasant Valley State Prison ("PVSP") Warden Paul Brazelton; the current Secretary of the CDCR Jeffrey Beard; former Secretary of the CDCR Matthew Cate; former Warden of Avenal State Prison ("ASP") James D. Hartley; former Director of the Division of Adult Operations Susan L. Hubbard; Director of CDCR's Office of Facility Planning, Construction and Management Deborah Hysen; Medical Director of Pleasant Valley State Prison Felix Igbinosa;

Receiver of the California Correctional Health Care Services Agency J. Clark Kelso; former head of the Department of Adult Institutions Scott Kernan; Senior Chief of Facility Planning, Construction and Management Chris Meyer; former Chief of CDCR's Classification Services Unit; former Deputy Director of Adult Institutions; former California Governor Arnold Schwarzenegger; former Statewide Medical Director Dwight Winslow; and former Warden of PVSP James A. Yates alleging deliberate indifference in violation of the Eighth Amendment and negligence under state law.[2]

Coccidioidomycosis (hereafter "Valley Fever") is a parasitic disease carried by a fungus-like organism that lives in the soil in certain limited geographic areas, including California.  (Id. ¶¶ 5, 37.)  The organism produces spores that when inhaled can lodge in the respiratory system and infect humans.  (Id. at ¶¶ 5, 38.)  Once in the body, the spores grow on host body tissue and the infection can become debilitating, disfiguring, intensely painful and can lead to death.  (Id. at ¶¶ 5, 39.)  Over thirty inmates have died of the disease and many more have serious medical complications from contracting Valley Fever.  (Id. at ¶¶ 5, 48.)

In some individuals the disease rapidly spreads to the lungs and other parts of the body. (Id. at ¶ 6.)  This is known as disseminated infection.  (Id.)  Disseminated infection attacks multiple organ systems, including the skin, lungs, eyes, bones, joints, nervous system, and the brain.  (Id. at ¶ 7.)  Depending on the site of the disseminated infection, it may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating to the pleura in the lungs, and the colonization of other organs including the brain.  (Id. at ¶ 39.)  Where Valley Fever progresses to disseminated infection, the individual needs lifelong treatment and can lose limbs, bones or organs, may suffer disfiguring skin lesions, and if the infection attacks the brain, may suffer permanent brain damage or die from coccidioidal meningitis.  (Id. at ¶¶ 7, 43, 44.)

Coccidioides replicate so quickly that it is considered the most virulent fungal parasite known to man and was once listed as a potential agent of biological warfare and bioterrorism.

---

[2] On January 23, 2015, District Judge Lawrence J. O'Neill issued an order granting Plaintiff's notice of voluntary dismissal of Defendant Kelso.  (ECF No. 135.)

(Id. at ¶ 40.)  The Centers for Disease Control ("CDC") requires scientists handling Coccidioides spores to use protective protocols just one level below that required for handling the Ebola virus. (Id.)

In the general population, 40 percent of individuals who contract Valley Fever will show symptoms of a respiratory illness that resembles the flu that may last for weeks or months.  (Id. at ¶ 41.)  In some segment of that 40 percent, the infections cause severe life-threatening pneumonia or disseminated infection to other parts of the body.  (Id.)  This percentage can vary depending on the ethnicity or medical status of the individual because certain ethnic and racial groups, including African-Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as individuals who are immune compromised or immune-suppressed, are more susceptible for developing disseminated infection.  (Id. at ¶¶ 8, 42.)

There is no cure for Valley Fever in its disseminated form.  (Id. at ¶ 45.)  The disease is treated with antifungal drugs that can have severe side effects and must be taken for a lifetime. (Id.)  The drugs do not eliminate, but reduce the population of infectious spores.  (Id.)  This does not eliminate the disease but keeps the disease partially and temporarily at bay and debilitating relapses can be expected.  (Id.)  Treatment is expensive, and the cost of medication can be in the range of $5,000 to $20,000 per year.  (Id. at ¶ 48.)  Seventy-five percent of individuals who stop taking the drugs can be expected to relapse into life-threatening disease within a year.  (Id. at 45.)

Plaintiffs contend that California health officials have known about the prevalence of Valley Fever in the location of the prisons and the acute risks to inmates for over fifty years.  (Id. at ¶ 49.)  By the late 1960s, employers were warned that bringing susceptible workers into the endemic areas carries with it the responsibility to reduce the rate and severity of infection and providing a vigorous program of medical surveillance.  (Id. at ¶ 50.)  Despite this, between 1987 and 1997, the CDCR built eight prisons in the "hyper-endemic" regions of the San Joaquin Valley: ASP, California Correctional Institution, California State Prison-Corcoran, Wasco State Prison, North Kern State Prison, PVSP, California State Correctional Facility-Corcoran, California Substance Abuse and Treatment Facility-Corcoran, and Kern Valley State Prison.  (Id. at ¶ 51.)  Two of these prisons, ASP and PVSP, have increased risks of contracting Valley Fever

1   and PVSP was known by 2006 to be extraordinarily dangerous.  (Id. at ¶ 53.)

2         PVSP, located in Coalinga, California, provides long-term housing and services for

3   minimum, medium, and maximum custody inmates, with approximately 730 staff and 5,188

4   inmate beds.  (Id. at ¶ 54.)  The area in which PVSP is located is known to be contaminated with

5   Valley Fever spores.  (Id. at ¶ 55.)

6         In November 2004, Defendant Kanan, wrote a memorandum ("Kanan Memo") to all

7   health care managers, staff members, and other officials within CDCR regarding Valley Fever

8   and its origin in soil fungus.  (Id. at ¶ 56.)  This memorandum included a three page overview of

9   Valley Fever, its cause, diagnosis, symptoms, and treatment.  (Id. at 57.)  This memorandum

10   acknowledged that prisons in the Central Valley are located in areas that host spores in the soil;

11   Valley Fever is potentially lethal to individuals exposed to the fungus; winds and construction in

12   the area can cause the organism to be blown into the air where it can be inhaled and pneumonia

13   may occur; a percentage of exposed individuals will get pneumonia or disseminated disease; the

14   risk and incidence of disseminated disease is greatest in American Indians, Asians, African-

15   Americans, and immuno-compromised individuals; dissemination usually occurs to the skin,

16   bones and meninges although any body part can be involved; bone lesions, back pain and

17   paraplegia can result; skin lesions often herald widespread dissemination; meningeal involvement

18   eventually leads to a severe unremitting headache; and treatment must be continued for life to

19   control symptoms and there is no cure at this time.  (Id. at ¶ 57.)  This memo was and continues to

20   be widely available to state officials, including Defendants.  (Id. at ¶ 58.)

21         In late summer to early fall of 2005 construction began on a new state facility immediately

22   adjacent to PVSP.  (Id. at ¶¶ 68, 69.)  The construction churned up and broadcast the spores into

23   the air and onto bare soil and surfaces throughout the prison.  (Id. at ¶ 68.)

24         In 2005, PVSP began to experience an epidemic of Valley Fever, including multiple

25   deaths from the disease.  (Id. at ¶ 59.)  Infection rates at PVSP were as high as 1,000 times the

26   rate seen in the general population.  (Id. at ¶ 60.)  An internal CDCR memorandum dated October

27   27, 2006 to all administrative personnel showed an increase in the number of inmates testing

28   positive for Valley Fever in 2006 with 5 deaths in 2005 and 8 deaths in 2006.  (Id. at ¶ 61.)  This

memo showed the incidence of Valley Fever increased at PVSP by more than 445 percent between 2001 and 2005 with an increase of over 2,500 percent in 2006.  (Id. at ¶ 62.)  An August 3, 2006 internal memorandum confirmed that CDCR officials knew that they were exposing inmates to elevated risks of Valley Fever.  (Id. at ¶ 63.)

In 2006, the California prison system accounted for 30 percent of all Valley Fever cases reported to the State Department of Health Services.  (Id. at ¶ 62.)  From 2006 to 2010, rates of Valley Fever in the "hyper-endemic" area prisons worsened.  (Id. at ¶ 64.)  Infection rates at PVSP, ASP, Wasco, and North Kern were significantly higher than the rates of the counties in which they were located.  (Id.)  PVSP's infection rate was 1,100 times higher than the rate in California, ASP was 189 times higher, and Wasco was 114 times higher.  (Id.)

A letter dated March 16, 2006 written by a doctor from the California Department of Health Services referenced the exceptionally high risk groups in a letter to an inmate at PVSP and cited a contemporaneous medical journal article.  (Id. at ¶ 83.)

In 2006, the California Department of Public Heath ("CDPH"), Center for Infectious Disease conducted an epidemiological study of Valley Fever in California prisons.  (Id. at 107.)  The study, published in January 2007, found that the number of cases of Valley Fever at PVSP in 2005 was three times that of the combined total of Fresno County combined.  (Id. at ¶¶ 107, 108.)  The CDPH made recommendations regarding Valley Fever on January 11, 2007, and noted that studies suggested that the risk for complications is increased for persons of African or Filipino descent and the risk is even higher for immunosuppressed individuals.  (Id. at ¶ 87.)  The study recommended that CDCR evaluate relocating the highest risk groups to areas that are not hyperendemic, and to take steps at the prison to minimize exposure, including ventilation, respiratory protection and dust suppression and soil control.  (Id. at ¶ 109.)

At some point the California Corrections Health Care Services ("CCHCS") requested assistance from the CDPH in assessing the magnitude of the problem.  (Id. at ¶ 70.)  CDPH reported that the rate of Valley Fever cases at PVSP was 38 times that of the residents of Coalinga and 600 times the rate in Fresno County.  (Id. at ¶ 71.)  The CDPH reported the risk of the disease was associated with increased outdoor time, pre-existing health conditions, and

African-American race.  (Id. at ¶ 71.)  The CDPH report included recommendations for reducing incidents of Valley Fever at the hyper-endemic prisons.  (Id. at ¶ 72.)

Based on CDPH's report, the CCHCS issued recommendations in June 2007 that included; using environmental mitigation in the prisons by landscaping with ground cover and placing other dust reducing material on the grounds; continuing to divert and relocate inmates at high risk of Valley Fever; reinstating the public health system in prisons; notifying the local health departments of new cases; expanding epidemiologic research around cocci; supporting vaccine research; and not expanding prison beds in the hyperendemic area, including at PVSP. (Id. at ¶ 73.)

In September 2007, Defendant Schwarzenegger proposed that the state construct new dormitories at PVSP to expand by 600 the number of beds available to house prisoners.  (Id. at ¶ 100.)  During a press conference to announce the expansion plans, Defendant Schwarzenegger responded to questions about the expansion inevitably exposing more inmates to Valley Fever by indicting they would go ahead and build.  (Id. at ¶ 101.)

In November 2007, Defendants Hubbard and Winslow amended the 2006 exclusion policy to protect persons with certain identified medical conditions.  (Id. at ¶ 74.)  The policy did not exclude those high risk racial and ethnic groups.  (Id.)

In 2007, the CDCR Facilities Department Senior Management officials stated they were preparing to implement measures to reduce the risk of inmates contracting Valley Fever at PVSP, including extensive measures to control inmate exposure to contaminated soil and improved ventilation systems.  (Id. at ¶¶ 113, 114.)  This plan was not implemented until six years later. (Id. at ¶ 115.)  Additionally in 2007, the New York Times published an article about the Valley Fever epidemic at PVSP which quoted Defendant Yates surmising that the inmates contracted Valley Fever by breathing the spores as they walked around out there.  (Id. at ¶ 117.)

In 2009, the CDCR requested and then terminated a project by federal health agencies to assist California with the Valley Fever epidemic.  (Id. at ¶ 77.)  In December 2009, the federal agencies wrote a letter to the CDCR indicating that work on the project ceased due to CDCR's lack of support in assisting with the federal agencies investigation, and reminded the CDCR that

African-Americans, and individuals of Asian or Filipino descent and immuneocompromised individuals were at greater risk of developing disseminated infection.  (Id. at ¶ 78.)

In April 2012, the California Correctional Health Care Services ("CCHCS") released a report that received general circulation among CDCR staff which found that nothing done between 2006 and 2010 had any effect on the Valley Fever rates at PVSP and ASP.  (Id. at ¶¶ 112, 113.)

From 2006 through 2012, approximately 1,800 inmates became infected at PVSP.  (Id. at ¶ 65.)  Infection rates were also higher than the rate of infection in Kern County.  (Id. at ¶ 66.) An April 2012 study found that the infection rate at PVSP was seven out of every one hundred inmates.  (Id.)  From 2007 through 2010, the rate of infection at PVSP was six times higher than the infection rate at the adjacent mental health facility.  (Id. at ¶  76.)  Of the twenty seven inmates that died of Valley Fever between 2006 and 2010, the rate of deaths for African-Americans (68 percent) was twice that of non-African-American inmates.  (Id. at ¶ 67.)  A report by Dr. Pappagianis attributed the increase in Valley Fever incidents to the new construction that occurred in 2005-2006.  (Id. at ¶ 69.)

A 2012 study in the journal Emerging Infectious Disease found the rate of hospitalization from disseminated infection was 8.8 times higher among African-Americans than whites.  (Id.) In 2013, Dr. Galgiani analyzed reports from the Receiver's Office and noted that African-American inmates in the Central Valley died from Valley Fever at higher rates than the general inmate population and comprised 71 percent of the inmate deaths from Valley Fever between 2006 and 2011.  (Id. at ¶ 88.)

The Receiver's Office took steps to force CDCR to relocate the high risk inmates.  (Id. at ¶ 90.)  A spokesperson for the Receiver's office stated that the State of California has known since 2006 that segments of the inmate population were at a greater risk of contracting Valley Fever and mitigation efforts have proven ineffective.  (Id. at ¶ 90.)

Plaintiffs contend that Defendants were aware that housing inmates at prisons in the hyperendmic region posed an elevated risk of inmates contracting Valley Fever by the 2004 Kanan Memo which was intended to be circulated to all health care professionals in the CDCR

10

1   system.  (Id. at ¶¶ 91-92.)

2         In 2005 a prisoner's rights group sent an informational packet to Defendant

3   Schwarzenegger describing the threat posed by Valley Fever and the threat to African-Americans,

4   Filipinos, elderly inmates and the immune compromised.  (Id. at ¶ 93.)

5         In 2006-2007, a Fresno Grand Jury undertook the task of evaluating inmate issues at

6   PVSP and made recommendations.  (Id. at ¶ 94.)  Beginning in 2007, the Grand Jury issued

7   periodic public reports stating that inmates and staff continue to be at risk from Valley Fever.  (Id.

8   at ¶ 95.)  The Grand Jury issued these reports starting in 2007 and continuing each year after to

9   Defendants Brazelton, Yates, and Cates, as well as to other CDCR officials.  (Id. at ¶ 96.)  The

10  Grand Jury required Defendants Yates, Cates, and Brazelton to respond directly regarding the

11  findings in the reports.  (Id. at ¶ 97.)  The Grand Jury found that the disease rates for all groups at

12  the prison had increased dramatically since 2004 and that African-Americans, Hispanics,

13  Filipinos and other Asians were at a far greater risk than other ethnicities.  (Id. at ¶ 98.)  These

14  reports informed Defendants Yates, Cates, and Brazelton that inmates were at an increased risk

15  from Valley Fever if they were housed or remained at PVSP.  (Id. at ¶ 99.)

16        CDCR publishes and distributes an orientation manual for all medical personnel that

17  discusses Valley Fever in detail.  (Id. at ¶ 103.)  The orientation manual notes that African-

18  Americans, Filipinos, and those with compromised immune systems or chronic diseases are at a

19  greatly increased risk of developing disseminated infection.  (Id.)  This orientation manual is

20  authorized and promulgated by Defendant Winslow.  (Id. at ¶ 104.)  All medical personnel and

21  facility management were aware of the information in the orientation manual.  (Id. at ¶ 105.)

22        Plaintiffs allege that the defendants had the ability to divert inmates away from the

23  hyperendmic prisons and failed to implement remedial measures that were recommended by their

24  own experts.  Further, Plaintiffs contend that Defendants had the power to prevent the plaintiffs

25  from being assigned to hyperendemic prisons, could have used a routine review process to

26  transfer Plaintiffs to safer facilities, and failed to implement remedial measures to reduce the risk

27  of infection.

28  / / /

1
2

**IV.**

**ANALYSIS**

3      Defendants Beard, Brazelton, Cate, Hartley, Hubbard, Hysen, Kernan, Meyer, Rothchild,
4  Schwartz-Reagle, Schwarzenneger, and Yates move to dismiss this action pursuant to Rule 12(b)
5  on the grounds that 1) the consolidated complaint does not allege that any Defendant personally
6  caused the alleged constitutional deprivations; 2) Defendants are entitled to qualified immunity;
7  3) Plaintiffs Corley and Spences claims are barred by the statute of limitations; 4) Plaintiffs'
8  negligence cause of action should be dismissed as almost no Plaintiff has complied with
9  California's Government Claims Act; and 5) those Plaintiffs only alleging a claim for negligence
10  under state law should be dismissed.  Defendants Igbinosa and Winslow join in the motion to
11  dismiss and additionally, move to dismiss on the same grounds.[3]

12      Defendants contend that they are entitled to qualified immunity for the decision to house
13  inmates in areas in which Valley Fever spores naturally occur and for any failure to provide
14  environmental safeguards.  Plaintiff argues that it was clearly established that housing inmates in
15  endemic areas and failing to implement environmental safeguards would violate the inmates'
16  Constitutional rights.  Plaintiff further counters that the allegations in the complaint are sufficient
17  to state a claim against the individual defendants and the right at issue was established more than
18  twenty years ago.

19      While Defendants move to dismiss this action for failure to state a claim, the Court finds
20  that addressing the issue of qualified immunity in the first instance is appropriate here.

21      **A.     Qualified Immunity**

22      1.     Qualified Immunity Legal Standard

23      The doctrine of qualified immunity protects government officials from civil liability
24  where "their conduct does not violate clearly established statutory or constitutional rights of
25  which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)

26

27

28

_____

[3] Defendants Igbinosa and Winslow bring a motion to dismiss any claims against them based upon deliberate indifference to medical needs due to policies or procedures implemented at the prison.  At the April 29, 2015 hearing, Plaintiffs conceded that they are not bringing any claims based upon medical care or medical policies.  Plaintiffs stated the claims raised in this action are for housing inmates in areas which caused exposure to Valley Fever.

12

1   (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled

2   to qualified immunity the court uses a two part inquiry.  Saucier v. Katz, 533 U.S. 194, 200

3   (2001).  The court determines if the facts as alleged state a violation of a constitutional right and

4   if the right is clearly established so that a reasonable official would have known that his conduct

5   was unlawful. Saucier, 533 U.S. at 200.

6          The district court is "permitted to exercise [its] sound discretion in deciding which of the

7   two prongs of the qualified immunity analysis should be addressed first in light of the

8   circumstances in the particular case at hand." Pearson, 555 U.S. at 236.  The inquiry as to

9   whether the right was clearly established is "solely a question of law for the judge." Dunn v.

10  Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't.

11  556 F.3d 1075, 1085 (9th Cir. 2009)).  In deciding whether officials are entitled to qualified

12  immunity, the court is to view the evidence in the light most favorable to the plaintiff and resolve

13  all material disputes in the favor of the plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th

14  Cir. 2003).

15          2.      The Question at Issue Is Whether Housing Inmates In Prisons In Areas Endemic
                   For Valley Fever, A Naturally Occurring Soil-Borne Fungus Which Can Lead To
16                 Serious Illness, Would Violate the Eighth Amendment

17          Initially, Plaintiffs rely on this Court's finding in Jackson that Defendants were not

18  entitled to qualified immunity on similar claims.  In the initial finding and recommendation

19  addressing qualified immunity in Jackson, 1:13-cv-01055-LJO-SAB (E.D. Cal. February 20,

20  2014), this Court framed the issue as whether failing to protect high risk inmates from the risk of

21  developing disseminated disease would violate the Eighth Amendment.  Id. at 16:21-18:23.

22  However, upon consideration of the issue in the current motion, the Court finds this is not the

23  correct question.  Therefore, the Court finds that it is appropriate to address the substance of the

24  qualified immunity claim in this motion to dismiss.  Further to the extent that this Court

25  previously cited Helling v. McKinney, 509 U.S. 25 (1993), for the proposition that Defendants

26  are not entitled to qualified immunity; it now finds that this action is distinguishable.

27          Defendants contend that they are entitled to qualified immunity because there is no clearly

28  established right not to be housed in the Central Valley or otherwise be subjected to the

13

environmental risk of Valley Fever.  Plaintiffs contend that Defendants are defining the right too narrowly.  Plaintiffs argue that the right to be addressed here is the significant increased risk of infection from Valley Fever.

It is the plaintiff that bears the burden of demonstrating that the right was clearly established at the time that the defendants acted.  May v. Baldwin, 109 F.3d 557, 561 (9th Cir. 1997).  Defendants cannot be held liable for a violation of a right that is not clearly established at the time the violation occurred.  Brown v. Oregon Dep't of Corrections, 751 F.3d 983, 990 (9th Cir. 2014).  A constitutional right is clearly established when its contours are "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  In light of the preexisting law the lawfulness of the officials act must be apparent.  Id. at 739.  The court is to look to the state of the law at the time the defendants acted to see if it gave fair warning that the alleged conduct was unconstitutional.  Id. at 741.

Further, the Supreme Court has emphasized that it is often difficult for an official to determine how relevant legal doctrine will apply to the specific situation that is faced and that is why qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law[.]"  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  It is not sufficient for Plaintiffs to merely argue the general rule that prison officials cannot deliberately disregard an excessive risk of harm.  Estate of Ford, 301 F.3d at 1051.

When we are considering whether the official had notice that his conduct was unlawful, we look not to the harm that results, but what condition the inmate was exposed to that could cause the harm.  In Helling, the question was not how serious the harm to the inmate could be from second hand smoke, but whether exposing the inmate "to levels of ETS that pose an unreasonable risk of serious damage to his future health" would violate the Eighth Amendment.  509 U.S. at 35.  The condition the inmate was exposed to was ETS due to being housed with a cellmate who smoked five packages of cigarettes per day.

While Plaintiffs argue that in determining qualified immunity we consider the risk of disseminated disease, Plaintiffs were not exposed to disseminated disease.  Plaintiffs allege that

14

they were housed in the Central Valley in an area where spores that cause Valley Fever are endemic.  The majority of Plaintiffs allege that they have some factor which causes them to be at an increased risk of developing disseminated infection from Valley Fever.  If Plaintiffs are correct that we look only to the harm that could result, the right to be free from any act that caused significant harm would be clearly established and Defendants could never be granted qualified immunity.  That is clearly not the intent of the law.

During the April 29, 2015 hearing, Plaintiffs argued that qualified immunity cannot mean that the first time a right is violated the defendants are not liable.  But where a right is not clearly established a defendant is entitled to qualified immunity from damages.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  That is not to say that the plaintiff is without remedy for his injury as he could seek tort damages for violations of state law.  But the question we address here is whether it is clearly established that the conduct at issue would violate the inmates' federal rights.

When confronted with a claim for qualified immunity we are to ask "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right."  Brosseau v. Haugen, 543 U.S. 194, 197 (2004).  This inquiry is to be taken in light of the specific context of the case and not as a broad general proposition.  Brosseau, 543 U.S. at 198.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 199 (quoting Saucier, 533 U.S. at 202).  Prison officials are entitled to qualified immunity where it is not clearly established that the conduct complained of would violate the Eighth Amendment.  Pearson, 555 U.S. at 243.

The Supreme Court has told us that we are not to define clearly established law at a high level of generality.  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011).  While Plaintiffs rely on the risk of harm and argue the general rule, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  Wilson

v. Layne, 526 U.S. 603, 615 (1999).   The Ninth Circuit recently addressed a deliberate indifference claim in which an arrestee was placed in the drunk tank and was attacked by another detainee.   Castro v. Cnty. of Los Angeles, __ F.3d.__, 2015 WL 1948146, at *1-2 (9th Cir. May 1, 2015).  The right at issue was not merely the right to be free from a risk of violence, but was found to be "the right to be free from violence at the hands of other inmates."   Id.

Here, Plaintiffs allege that they were exposed to Coccidioides fungal spores that exist in the soil and when inhaled can cause Valley Fever.   The Court finds that the question to be addressed here is whether it was clearly established that housing inmates in prisons in areas endemic for Valley Fever, a naturally occurring soil-borne fungus which can lead to serious illness, would violate the Eighth Amendment.[4]

> 3.   It is not clearly established that environmental exposure of inmates to Valley Fever would violate the Eighth Amendment

Plaintiffs argue that Defendants "gloss over the first inquiry –whether a constitutional right was violated." (ECF No. 154 at 21.)  However, as here, where Defendants are arguing that it is unclear whether the right at issue exists, the Court can consider the second prong of the inquiry first.  Pearson, 555 U.S. at 236.

Qualified immunity shields an official from personal liability where he reasonably believes that his conduct complies with the law.  Pearson, 555 U.S. at 244.  " 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.' "  Stanton v. Sims, 134 S.Ct. 3, 5 (2013) (citations omitted).  In determining whether the defendant is entitled to qualified immunity, the court is to determine if "a reasonable officer would have had fair notice

---

[4] In determining how to frame the right at issue, the Court considers Helling.  In Helling, the inmate was alleging that he was exposed to a condition created by other prisoners smoking cigarettes with exposed him to environmental tobacco smoke ("ETS").  The Helling court did not frame the right as a manmade condition that could cause a serious risk of harm.  In Helling, the Supreme Court considered whether exposing the inmate "to levels of ETS that pose an unreasonable risk of serious damage to his future health" would violate the Eighth Amendment. 509 U.S. at 35.  The court considered the specific substance to which the inmate alleged he was exposed that would cause him harm. Similarly in this instance, the Court considers that Plaintiffs are alleging they were exposed to spores which can cause Valley Fever.  However, as discussed below, the Court is not requiring a case to be directly on point, but is analyzing whether prior case law would place Defendants on notice that the exposure of inmates to Valley Fever would violate their rights under the Eighth Amendment.

that [the action] was unlawful, and that any mistake to the contrary would have been unreasonable." Chappell v. Mandeville, 706 F.3d 1052, 1056-57 (9th Cir. 2013) (quoting Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1060–61 (9th Cir. 2003)).

Prison officials are entitled to qualified immunity where it is not clearly established that the conduct complained of would violate the Eighth Amendment. Pearson, 555 U.S. at 243. Under the Eighth Amendment, prison officials cannot be deliberately indifferent to conditions of confinement that create a substantial risk of significant harm. Farmer v. Brennan, 511 U.S. 825, 847 (1994). To prove a violation of the Eighth Amendment a plaintiff must "objectively show that he was deprived of something 'sufficiently serious,' and make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citations omitted). "A deprivation is sufficiently serious when the prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (internal punctuation and citations omitted). A plaintiff satisfies the objective component of whether he has been exposed to a sufficiently serious deprivation by showing that he is incarcerated under conditions that pose a substantial risk of serious harm. Lemire v. California Dep't of Corrections and Rehabilitation, 726 F.3d 1062, 1075 (9th Cir. 2013). Therefore, the Court shall examine the state of the law to determine if it is clearly established that housing inmates in prisons in areas endemic for Valley Fever would violate the Eighth Amendment.

### a.   There does not have to be case directly on point, but prison officials must have had fair notice that the conduct violates the Eighth Amendment

It is not required that there be a case directly on point before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." Stanton, 134 S.Ct. at 5 (quoting al-Kidd, 131 S.Ct. at 2085). It was in Hope that the Supreme Court established that a case need not be fundamentally similar for prison officials to have notice that their conduct would violate the Eighth Amendment.

In Hope, an inmate appealed the finding that prison officials were entitled to qualified immunity for handcuffing him to a hitching post for hours as a form of punishment. Hope, 536

U.S. at 735.  The district court found that although the actions violated the Eighth Amendment, the officials were entitled to qualified immunity.  Id.  The Eleventh Circuit affirmed, stating that, while there were two analogous cases, there were no cases with materially similar facts to place defendants on notice.  Id.  The Supreme Court reversed holding that precedent does not require a factual situation to be fundamentally similar, but the prior decision must give reasonable warning that the conduct at issue would violate a constitutional right.  Id. at 740.

At the time the defendants acted there were two cases, Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974) and Ort v. White, 813 F.2d 318 (11th Cir. 1987), which held that corporal punishment which runs afoul of the Eighth Amendment, such as handcuffing inmates to a crate or cell for long periods of time and denial of drinking water after the prisoner terminates his resistance, are not permitted.  Hope, 536 U.S. at 741-43.  The Court concluded that "Hope was treated in a way antithetical to human dignity—he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous[,]" not out of necessity, but as a punishment for prior conduct.  Id. at 745.  Gates and Ort provided sufficient notice that this conduct would be unconstitutional.  Id.  In applying the holding in Hope, this Court is to determine if there is case law that would have provided Defendants with sufficient notice that environmental exposure of inmates to Valley Fever would violate their Eighth Amendment rights.

Significantly, the Eighth Amendment prohibits punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  Estelle v. Gamble, 429 U.S. 97, 102 (1976) (citations omitted).  Conditions that cannot be said to be cruel and unusual under contemporary standards of decency do not violate the Eighth Amendment.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

   **b.**   **Review of Supreme Court, Circuit, and District Court Decisional Law Shows That Defendants Do Not Have Notice That Environmental Exposure to Valley Fever Would Violate the Eighth Amendment**

In determining if the law is clearly established we first look to binding precedent.  Chappell, 706 F.3d at 1056.  If there is none on point, we look to other decisional law, including the law of other circuits and district courts.  Id. at 1056; Osolinski v. Kane, 92 F.3d 934, 936 (9th

Cir. 1996).  The Court finds no Supreme Court or published Ninth Circuit case that has addressed whether an inmate's environmental exposure to Valley Fever or any other environmental organism would be a violation of the Eighth Amendment.[5]  Therefore, the Court looks to other conditions of confinement cases addressing environmental exposure to determine if the right at issue is clearly established.

> i. **The Court finds no Supreme Court or Ninth Circuit precedent to place Defendants on notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment**

> a) **Helling is distinguishable from the situation confronted by prison officials here**

Plaintiffs rely on Helling to argue that the right to be free from environmental exposure to Valley Fever is clearly established.   In Helling, the Supreme Court addressed whether environmental exposure to environmental tobacco smoke ("ETS") would violate the Eighth Amendment.  The plaintiff alleged that he was housed with a cellmate who smoked up to five packages of cigarettes per day exposing the plaintiff to ETS that posed a risk to his health.  Helling, 509 U.S. at 27.  A court trial was held and after a directed verdict, judgment was entered for the defendants.  Id. at 29.  The Court of Appeals affirmed the lower court decision on the basis of qualified immunity, but held that, although the plaintiff did not have a constitutional right to a smoke free environment, plaintiff had stated a cause of action under the Eighth Amendment by alleging he was involuntarily exposed to levels of ETS that posed an unreasonable risk of harm to his future health.   Id.   In support of the judgment, the Court of Appeals noted the scientific

---

[5] There are two unpublished Ninth Circuit cases which remanded Valley Fever cases without discussion of what would be required to state a claim under the Eighth Amendment.  See Smith v. Schwarzenegger, 393 Fed.App'x 518, 2010 WL 3448591 (9th Cir. 2010) (not beyond a doubt that plaintiff could prove no set of facts entitling him to relief); Johnson v. Pleasant Valley State Prison, 505 Fed.App'x 631, 2013 WL 226722 (9th Cir. 2013) (given the low pleading threshold, dismissal of plaintiff's action at the pleading stage was improper, expressing no opinion as to the sufficiency or merits of the allegations).  "An unpublished disposition is, more or less, a letter from the court to parties familiar with the facts, announcing the result and the essential rationale of the court's decision."  Hart v. Massanari, 266 F.3d 1155, 1178 (9th Cir. 2001).  "[T]he disposition is not written in a way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not announced in a way that makes it suitable for governing future cases."  Hart, 266 F.3d at 1177-78.  "Unpublished dispositions and orders of [the Ninth Circuit] are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  CTA9 Rule 36-3.

1   opinion supporting plaintiff's contention that exposure to ETS could endanger an individual's

2   health and "society's attitude had evolved to the point that involuntary exposure to unreasonably

3   dangerous levels of ETS violated current standards of decency." Id.

4         The issue the Supreme Court addressed was whether the plaintiff had stated an Eighth

5   Amendment claim by alleging his compelled exposure to ETS posed an unreasonable risk to his

6   health. Helling, 509 U.S. at 31. The Supreme Court rejected the defendants' argument that only

7   deliberate indifference to an inmate's current serious health problem is actionable under the

8   Eighth Amendment, and held that the Eighth Amendment protects against future harm. Id. at 33.

9   The Supreme Court remanded stating:

10        The Court of Appeals has ruled that McKinney's claim is that the level of ETS to
          which he has been involuntarily exposed is such that his future health is
11        unreasonably endangered and has remanded to permit McKinney to attempt to
          prove his case. In the course of such proof, he must also establish that it is
12        contrary to current standards of decency for anyone to be so exposed against his
          will and that prison officials are deliberately indifferent to his plight. We cannot
13        rule at this juncture that it will be impossible for McKinney, on remand, to prove
          an Eighth Amendment violation based on exposure to ETS.
14        Id. at 35.

15        [W]ith respect to the objective factor, determining whether McKinney's
          conditions of confinement violate the Eighth Amendment requires more than a
16        scientific and statistical inquiry into the seriousness of the potential harm and the
          likelihood that such injury to health will actually be caused by exposure to ETS.
17        It also requires a court to assess whether society considers the risk that the
          prisoner complains of to be so grave that it violates contemporary standards of
18        decency to expose anyone unwillingly to such a risk. In other words, the prisoner
          must show that the risk of which he complains is not one that today's society
19        chooses to tolerate.

20  Id. at 36.

21        The Court finds that Helling is distinguishable for two interrelated reasons. First, in this

22  instance, Plaintiffs are exposed to a naturally occurring fungus that lives in the soil in the Central

23  Valley. Helling did not address a naturally occurring condition that causes the same risk to those

24  in the surrounding community. Second, the Helling court recognized that society's attitude had

25  evolved to the point that involuntary exposure to unreasonably dangerous levels of ETS violated

26  current standards of decency. That is not the case here where society accepts exposure to Valley

27

28

Fever.[6]  Since Helling is distinguishable as it does not address an environmental condition that exposes the general community to a risk of harm, it does not provide reasonable warning that the conduct at issue here would violate a constitutional right.  Hope, 536 U.S. at 740.

The Court therefore turns to precedential Ninth Circuit decisions addressing exposure of inmates to an environmental condition to determine if there is a case sufficiently similar to give Defendants reasonable warning that the conduct here would violate the Eighth Amendment.  The majority of Ninth Circuit cases that consider environmental conditions of confinement address exposure to ETS which the Court finds to be distinguishable as discussed above.

> **b)**   **Neither Ninth Circuit decisions nor common sense would clearly establish that housing inmates in an area endemic to Valley Fever would violate the Eighth Amendment**

The Ninth Circuit has recognized that a right can be established by precedent or by common sense.  Newell v. Sauser, 79 F.3d 115, 117 (9th Cir. 1996).  In determining whether the law is clearly established in this instance, the Court therefore considers both precedent and whether common sense would clearly establish the right.

Plaintiffs argue that Kelley v. Borg, 60 F.3d 664 (9th Cir. 1995), establishes the right not to be exposed to a significant risk of harm.  In Kelley, the Ninth Circuit considered a case in which an inmate complained of fumes in his cell from which officers refused to remove him during a lockdown.  60 F.3d at 665.  A short time later, the inmate became unconscious and was taken to the infirmary.  Id. at 666.  The appellate court affirmed the district court's holding that it was clearly established that this was deliberate indifference to a serious medical need.  Id. at 666-67.  While Plaintiffs argue that Kelley establishes that Defendants had notice that their conduct would violate the Eighth Amendment, Kelley does not stand for the general proposition that any condition that would cause substantial harm to an inmate would violate the Eighth Amendment.  Therefore, Plaintiffs' reliance on Kelley to show that the right at issue here is clearly established

---

[6] As discussed in detail below, over a million people live in areas in which the cocci spores are endemic and are subjected to the risk of contracting Valley Fever.  Further, tens of thousands of individuals live in those areas that are considered to be hyperendemic and are exposed to the risk of contracting Valley Fever.  Additionally, the employees who work within the prison and those who visit the prison are exposed to the cocci spores and tolerate the risk of contracting Valley Fever.

1  is misplaced.

2   Where an inmate is in imminent danger from an environmental hazard, case law is not

3  required to determine that the right was clearly established.  This is an instance where common

4  sense would lead a reasonable prison official to determine that this would violate an inmate's

5  rights.  Newell, 79 F.3d at 117.  However, it is not so obvious for every instance where an inmate

6  is subjected to an environmental condition and complains that it violates the Eighth Amendment.

7  See Sawyer v. Cole, No. 3:10-cv-00088-RCJ-WGC, 2012 WL 6210039, *4 (D. Nev. Dec. 12,

8  2012) aff'd, 563 F. App'x 589 (9th Cir. 2014) (qualified immunity applies where inmate alleged

9  he became ill due to mold, fungus, bacteria and otherwise unsanitary conditions in his cell.

10  "[T]he right against seriously dangerous unsanitary conditions cannot be held to be 'clear' at a so

11  high level of generality that any claim of uncleanliness necessarily rises to the level of a

12  constitutional violation against which an officer has no qualified immunity.")  The right alleged

13  here is not so obvious that common sense would dictate the result of the inquiry.

14   In Wallis v. Baldwin, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit considered an

15  inmate's claim that prison officials violated his rights when he was required to clean attics which

16  included cleaning up insulation containing asbestos without adequate protective gear or training.

17  70 F.3d at 1075.  The evidence did not show that any minimum exposure to asbestos was

18  considered safe.  Id. at 1075.  The plaintiff presented evidence that the prison officials were aware

19  of the existence of the asbestos and during the time he was assigned to clean the attic the plaintiff

20  had complained to officials about the asbestos.  Id. at 1077.  The court held that exposing the

21  inmate to a known carcinogen in which there is no known safe level for human exposure violated

22  the Eighth Amendment.[7]  Id. at 1078.  Therefore, it is clearly established that prison officials

23  cannot expose an inmate to conditions to which no human can safely be exposed.  Since Valley

24

25  [7] The Fifth Circuit held that for an inmate to state a claim for exposure to carcinogenic asbestos particles, he must
    show that he was exposed to unreasonably high levels of environmental toxins.  Herman v. Holiday, 238 F.3d 660,
26  664 (5th Cir. 2001).

27   In Powell v. Lennon, 914 F.2d 1459 (11th Cir. 1990), the Eleventh Circuit found that housing inmates in a
    dormitory in which workers removed pipes from the dormitory releasing large quantities of asbestos into the air
28  would violate the Eighth Amendment.

Fever spores are not considered a substance to which no human can safely be exposed this does not place Defendants on notice that environmental exposure to Valley Fever would violate the Eighth Amendment.

In Keenan v. Hall, 83 F.3d 1083 (9th Cir. 1996), an inmate brought suit complaining his conditions of confinement violated the Eighth Amendment.  One of the inmate's numerous claims alleged that "food at the IMU was 'spoiled, tampered with, cold, raw, [and failed] to meet a balanced nutritional level,' and that the water was 'Blue/Green in Color and Foul Tasting.' Keenan, 83 F.3d at 1091 opinion amended on denial of reh'g, 135 F.3d 1318 (9th Cir. 1998).  The Ninth Circuit held that "[f]ood that is spoiled and water that is foul would be inadequate to maintain health." Id.  However, exposing an inmate to an environmental condition that naturally occurs in the area is not similar to failing to provide fresh food and clean water.

The Court finds that none of these cases would provide sufficient notice to Defendants that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment.

     ii.    Out of circuit precedent does not provide sufficient notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment

Finding no Supreme Court or Ninth Circuit precedent that would place Defendants on notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment, the Court next considers out of circuit decisional law for guidance on the issue.  The Eleventh Circuit considered a class action in which inmates on death row alleged that they were subjected to cruel and unusual punishment by being exposed to summertime temperatures in their cells of between eighty to one hundred degrees.  Chandler v. Crosby, 379 F.3d 1278, 1283-86 (11th Cir. 2004).  The appellate court noted that while an inmate need not wait for a tragic event to occur before seeking relief, he must show that the challenged conditions are extreme. Chandler, 379 F.3d at 1289.  A plaintiff must show at the very least that there is an unreasonable risk of serious damage to his future health or safety and, quoting Helling, that the risk is one that society chooses not to tolerate.  Id.  The appellate court then examined other cases involving exposure to heat and ventilation.  Id. at 1291-95.  The court first found that the Eighth Amendment applied to an inmate's claim of inadequate cooling and ventilation and a claim may

23

be stated based upon the conditions in isolation or in combination.  Id. at 1294.  Second, the Eighth Amendment is concerned with the severity and the duration of the conditions to which the inmate is exposed.  Id.  Third, a prisoner's mere discomfort, without more, does not offend the Eighth Amendment.  Id.  The appellate court found that the heat the plaintiffs were exposed to was not unconstitutionally excessive.  Id. at 1297.  Considering the conditions the inmates were exposed to, the inmates did not meet the high bar to state a claim under the Eighth Amendment.  Id. at 1298; cf. Gates v. Cook, 376 F.3d 323 (5th Cir. 2004) (affirming injunctive relief for inmates subjected to profound isolation, lack of exercise, stench and filth, malfunctioning plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient mental health care, and exposure to psychotic inmates in adjoining cells which violates the Eighth Amendment).

In Rish v. Johnson, 131 F.3d 1092 (4th Cir. 1997), the Fourth Circuit considered inmates claims that requiring them to clean up blood and other bodily fluids from environmental surfaces without providing them with protective gear violated the Eighth Amendment.  131 F.3d at 1094.  The inmates had volunteered to work as orderlies.  Id.  As orderlies, they cleaned up after inmates who were infected with human immunodefiency virus (HIV) and hepatitis B which both may prove fatal.  Id. at 1094-95.  The district court denied the defendants' motion for summary judgment finding that "a reasonable person, especially a federal officer trained in the prevention of infection or charged with ensuring that inmates take the required precautions, would know that they were violating [the] inmates' constitutional rights if they refused to provide the required equipment or training."  Id. at 1095.  The appellate court reversed, finding "there is no clearly established law dictating that prison officials are deliberately indifferent to a substantial risk of bodily harm if they fail to provide equipment to inmates to ensure that they may follow universal precautions in performing the duties of an orderly."  Id. at 1101.

In a case which this Court finds to be factually analogous to this action, Carroll v. DeTella, 255 F.3d 470 (7th Cir. 2001), the plaintiff alleged that he was exposed to drinking water that was contaminated with radium.  255 F.3d at 471-72.  The plaintiff contended that over a four year period he was exposed to unsafe levels of radium that were in excess of the maximum set by

the Federal Environmental Protection Agency, while prison guards were provided with bottled water. Id. at 472. There were 80 other Illinois water systems that also had radium in their water supply, but there was no evidence regarding the actual radium level in those communities' water supply. Id. The Seventh Circuit found that:

> Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than certain and immediate, Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not. McNeil v. Lane, 16 F.3d 123, 125 (7th Cir.1993); Steading v. Thompson, 941 F.2d 498 (7th Cir.1991); Harris v. Fleming, 839 F.2d 1232, 1235–36 (7th Cir.1988); Clemmons v. Bohannon, 956 F.2d 1523, 1527 (10th Cir.1992) (en banc). Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. McNeil v. Lane, supra, 16 F.3d at 125; Givens v. Jones, 900 F.2d 1229, 1234 (8th Cir.1990). It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

Carroll, 255 F.3d at 472-73.

The Seventh Circuit also considered an asthmatic prisoner's claim that prison officials violated the Eighth Amendment by allowing him to be exposed to ETS from which he cannot escape due to his captivity. Steading, 941 F.2d at 499.[8] At this time, smoking was common in offices, restaurants, and other public places throughout the United States and the rest of the world. Steading, 941 F.2d at 500. The Seventh Circuit compared subjecting prisoners to tobacco smoke to restaurant owners subjecting their patrons to smokers and found that exposure to smoke could not be considered punishment. Id. The appellate court found that "[p]risoners allergic to the components of tobacco smoke, or who can attribute their serious medical conditions to smoke, are

---

[8] The Court does note that Schroeder v. Kaplan, 60 F.3d 834 (9th Cir. 1995) (unpublished), discusses that the Ninth Circuit has recognized that housing an inmate with a sensitivity to smoke in a cell with a heavy smoker may violate the Eighth Amendment. However, the Court does find that exposure to cigarette smoke is distinguishable as it was not a risk that society chose to tolerate at that time. Schroeder did not address whether exposure to a risk that society chooses to tolerate would violate the Eighth Amendment.

25

1    entitled to appropriate medical treatment, which may include removal from places where smoke

2    hovers." Steading, 941 F.2d at 500.  But subjecting inmates to the same conditions that society is

3    subjected to was not punishment and did not violate the Eighth Amendment.  Id.  Carroll and

4    Steading stand for the proposition that subjecting inmates to conditions of confinement to which

5    society is also subjected does not violate the Eighth Amendment.

6              iii.      Exposure to Valley Fever is a risk that society chooses to tolerate

7              Having reviewed Supreme Court and circuit case law, the Court finds that there is no case

8    that would place Defendants on notice that housing inmates in an area that is endemic for Valley

9    Fever would violate the Eighth Amendment.  In this instance, as in Carroll, where the radium was

10   in the water supply of 80 communities, a large number of individuals in the Central Valley are

11   exposed to Valley Fever spores in the environment.  The 2013 census shows that over a million

12   people reside in the San Joaquin Valley where the risk of Valley Fever is present.[9]  See United

13   States Census Bureau, State & County QuickFacts, Kern County, California (2013 estimated

14   population of 864,124) http://www.census.gov/quickfacts/#table/PST045214/06029,00;  Fresno

15   County        California        (2013       estimated       population       of       955,272)

16   http://quickfacts.census.gov/qfd/states/06/06019.html last visited Feb. 6, 2015.  Much of the

17   litigation regarding Valley Fever originates from inmates incarcerated at ASP which is located in

18   Avenal, California, or PVSP which is located in Coalinga, California.  (ECF No. 28 at ¶ 33.)

19   Tens of thousands of people live, work, and raise their families in the vicinity of ASP and PVSP.

20   See       United       States       Census       Bureau,       Avenal,       California

21   http://quickfacts.census.gov/qfd/states/06/0603302.html (last visited February 2, 2015) (2013

22   estimated     population     of     14,176);     City     of     Coalinga     HomePage     located     at

23   http://www.coalinga.com/?pg=1 (last visited February 2, 2015) (approximately 18,000 residents

24

25   [9] Under the Federal Rules a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it
     is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready
26   determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Judicial
     notice may be taken "of court filings and other matters of public record."  Reyn's Pasta Bella, LLC v. Visa USA,
27   Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

28

                                                         26

in Coalinga); Pleasant Valley State Prison HomePage located at http://www.cdcr.ca.gov/Facilities_Locator/PVSP.html. Additionally, West Hills Community College is located in Coalinga. See City of Coalinga HomePage located at http://www.coalinga.com/?pg=1 (last visited February 9, 2015). It cannot be disputed that a significant number of individuals from all of the high risk categories identified by Plaintiffs live in those areas identified as hyperendemic.[10] See Consolidated Compl. at ¶¶ 108, 145 (African Americans, Hispanics, Filipinos, and other Asians). Carroll, which dealt with exposure to a condition of confinement that is common to the surrounding community, provides support for Defendants position that exposing inmates to the risk of Valley Fever does not violate the Eight Amendment.

Spores which cause Valley Fever exist in the San Joaquin Valley and the fact that the prison is located in this area is the basis of Plaintiffs' allegations. As in Carroll, prison officials have not created the spores in the soil and the claim is that Defendants are failing to provide a "maximally" safe environment. However, the Court finds no case law indicating that prison officials are required to provide an environment that is safer than that of the surrounding communities.

Plaintiffs rely on several recommendations that have been made to relocate inmates out of the areas where Valley Fever spores are prevalent to reduce the incidence of Valley Fever to support their argument that Defendants were aware of the risk of harm. It is unclear from Plaintiffs' complaint if the references in the complaint are separate incidents or stem from the same recommendations. Plaintiffs state that after the CDCR requested assistance from the CDPH, the CDPH recommended continuing to divert and relocate inmates at high risk for Valley Fever. (ECF No. 113 at ¶¶ 70-73.) In a January 11, 2007 document, the CDCR concluded that exclusion of all high-risk inmates was the most effective method to decrease the risk of Valley

---

[10] Kern County's population is comprised of 9.6% of individuals over 65 years of age, 6.3% African American, 2.7% American Indian, 50.9% Hispanic, and 4.2% Asian. http://www.census.gov/quickfacts/#table/PST045214/06029,00. Fresno County's population is comprised of 10.9% of individuals over the age of 65, 5.9% African American, 3% American Indian, 51.6% Hispanic, and 10.5% Asian. http://quickfacts.census.gov/qfd/states/06/06019.html. Avenal is comprised of 4% of individuals over the age of 65, 10.5% African American, 1.2% American Indian, 71.8% Hispanic, and .7% Asian. http://quickfacts.census.gov/qfd/states/06/0603302.html.

1  Fever infections.  (Id. at ¶¶ 87.)  A January 2007 study published by the CDPH recommended

2  relocating the highest risk groups to areas that were not hyperendemic.  (Id. at ¶ 107-109.)  In

3  June 2007, the CDHS offered recommendations to reduce the incidence of Valley Fever by

4  relocating all inmates.  (Id. at ¶119.)  Although these studies and reports have recommended

5  considering relocating inmates to reduce the risk of Valley Fever infection, neither the State of

6  California nor the federal government have implemented any standards or restrictions on

7  exposure to Valley Fever.  Similarly, recommendations have not been issued to any sector of the

8  general public to relocate out of the area.

9        No governmental agency has found that the San Joaquin Valley or the communities where

10  these prisons are located are unsafe for general human habitation or for any specific group of

11  individuals in the general population.  Prison officials have no notice that they must provide safer

12  conditions for the inmates than the residents in the area in which the prisons are located.

13  Similarly, many of the plaintiffs are alleging that they are at a higher risk of developing

14  disseminated infection, but non-imprisoned individuals of these same groups would be subjected

15  to this same risk and society tolerates them residing in the San Joaquin Valley, even in these areas

16  with the highest concentration of Valley Fever spores.  It is not clearly established by decisional

17  case law that environmental exposure of inmates to Valley Fever would violate the Eighth

18  Amendment since it is a risk that is tolerated by society.  Carroll, 255 F.3d at 472-73.

19        **c.      Lower court decisions in the Ninth Circuit demonstrate that whether and**
**when exposure to Valley Fever would violate the Eighth Amendment is**
20        **subject to debate**

21        i.      District Court decisions on Valley Fever

22        The Court also looks to lower court decisions in the Ninth Circuit that have addressed

23  whether environmental exposure to Valley Fever can state a claim to determine if Defendants

24  would have notice that they are violating the rights of the inmates by housing them in endemic

25  areas.   Recently, District Judge O'Neill found that the mere exposure to Valley Fever was

26  sufficient to state a claim for deliberate indifference.  Beagle v. Schwarzenegger, No. 14-cv-

27  00430-LJO-SAB (E.D. Cal. July, 25, 2014) at ECF No. 74.  However, as Judge O'Neill

28  recognized in his opinion in Beagle, the weight of authority is that an inmate cannot state a claim

1    for violation of the Eighth Amendment based on confinement in a location where Valley Fever is

2    present.  Beagle, No. 14-cv-00430-LJO-SAB (July 25, 2014) (ECF No. 74 at 9:18-10:13).

3         Since exposure to Valley Fever is clearly a risk that society chooses to tolerate, this Court

4    has found that merely being housed in an area in which Valley Fever was prevalent is not

5    sufficient to state a claim.   See also Moreno v. Yates, No. 1:07-cv-1404-DGC, 2010 WL

6    1223131, at *2 (E.D. Cal. March 24, 2010) (granting summary judgment for defendants as society

7    tolerates the risk of Valley Fever).  Even today, courts considering this issue have held the same.

8    See Williams v. Biter, No. 1:14-cv-02076-AWI-GSA PC, 2015 WL 1830770, at *3 (E.D. Cal.

9    April 9, 2015 (finding that being housed at Kern Valley State Prison where Valley Fever spores

10   are present insufficient to state a claim); Hines v. Youssef, No. 1:13-cv-00357-AWI-JLT, 2015

11   WL 164215, at *4 (E.D. Cal. January 13, 2015) ("Unless there is something about a prisoner's

12   conditions of confinement that raises the risk of exposure substantially above the risk experienced

13   by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed

14   to a risk society would not tolerate."); Sullivan v. Kramer, No. 1:13-cv-00275-DLB-PC, 2014

15   WL 1664983, at *5 (E.D. Cal. April 23, 2014) (being confined in an area where Valley Fever

16   spores exist is insufficient to state a claim for deliberate indifference).  The weight of authority

17   shows that it is not clearly established that housing an inmate in an area where Valley Fever is

18   prevalent would violate his Eighth Amendment rights.  See Walker v. Andrews, No. 1:02-cv-

19   05801-AWI-GSA-PC, 2011 WL 3945354, at *19 (E.D. Cal. Sept. 7, 2011) adopted by ECF No.

20   183 ("The law is clear that the fact that Plaintiff was confined in a location where [V]alley

21   [F]ever spores existed which caused him to contract [V]alley [F]ever fails to state a claim under

22   the Eighth Amendment.").

23        Courts within this district have differed on whether an inmate who is subject to a risk

24   factor can state a claim for deliberate indifference.  See Smith v. Brown, No. 1:12-cv-0238-AWI-

25   JLT (PC), 2012 WL 1999858, at *4 (E.D. Cal. June 4, 2012) (allegation of increased risk of

26   Valley Fever due to asthma insufficient to state a claim); Jones v. Igbinosa, No. , at *3-4 (E.D.

27   Cal. July 19, 2010) (allegation that African-American inmate at greater risk of contracting Valley

28   Fever is insufficient to state a claim); Gilbert v. Yates, No. 1:09CV02050 AWI DLB, 2010 WL

1   5113116, at *4 (E.D. Cal. Dec. 9, 2010) subsequently aff'd, 479 F. App'x 93 (9th Cir. 2012)

2   (inmate alleging risk factors for Valley Fever did not state a claim for deliberate indifference for

3   failure to transfer him from PVSP); Hunter v. Yates, No. 1:07-cv-00151-AWI-SMS-PC, 2009

4   WL 233791, at *3 (E.D. Cal. January 30, 2009) (inmate alleging high risk of contracting Valley

5   Fever states a claim under the low pleading standard); Humphrey v. Yates, No. 1:09-cv-00075-

6   LJO-DLB (PC), 2009 WL 3620556, at * 3 (E.D. Cal. October 28, 2009) (finding allegation that

7   inmate caught Valley Fever twice due to preexisting respiratory conditions is sufficient to state a

8   claim); Barnhardt v. Tilton, No. 1:07-cv-00539-LJO-DLB (PC), 2009 WL 56004, at *4 (E.D. Cal.

9   January 7, 2009) (inmate's allegation that his diabetes placed him at increased risk of contracting

10  Valley Fever is insufficient to show a serious risk of harm to inmate's health).

11      More recent cases have found that an inmate claiming to be at an increased risk of

12  contracting Valley Fever could state an Eighth Amendment claim.  See Lua v. Smith, No. 1:14-

13  cv-00019-LJO-MJS, 2014 WL 1308605, at *2 (E.D. Cal. Mar. 31, 2014) (first prong of deliberate

14  indifference claim is satisfied where plaintiff identifies a factor responsible for increasing the risk

15  of contraction or severity of infection); Sparkman v. California Dep't of Corrections and

16  Rehabilitation, No. 1:12-cv-01444-AWI-MJS (PC), 2013 WL 1326218, at *3 (E.D. Cal. March

17  29, 2013) (inmate with chronic lung disease meets first prong of Eighth Amendment standard);

18  Holley v. Scott, No. 1:12-cv-01090-MJS (PC), 2013 WL 3992129, at *3 (E.D. Cal. Aug. 1, 2013)

19  (collecting cases).  But many courts have found that the allegation of increased risk of contracting

20  Valley Fever is insufficient to state a claim for violation of the Eighth Amendment.  Smith v.

21  Brown, No. 1:12-cv-0238-AWI-JLT (PC), 2012 WL 1574651, at *4 (May 3, 2012) (allegation

22  that inmate was African-American is insufficient to state a claim); Harvey v. Gonzalez, No. CV

23  10-4803-VAP (SP), 2011 WL 4625710, at *3 (C.D. Cal. July 27, 2011) (even if inmate alleged

24  that he was at high risk of contracting Valley Fever and defendants were aware of his risk that

25  would be insufficient to state a claim for violation of the Eighth Amendment); Clark v. Igbinosa,

26  No. 1:10-cv-01336-DLB PC, 2011 WL 1043868, at *2 (E.D. Cal. March 21, 2011) (allegation

27  that African-American inmate at greater risk of contracting Valley Fever is insufficient to state a

28  claim); Schroeder v. Yates, No. 1:10-cv-00433-OWW-GSA PC, 2011 WL 23094, at *1, (E.D.

1   Cal. January 4, 2011) (inmate alleging COPD and emphysema fails to state a claim); <u>James v.</u>

2   <u>Yates</u>, No. 1:08-cv-01706-DLB (PC), 2010 WL 2465407, at * 4 (E.D. Cal. June 15, 2010)

3   (allegation of higher risk due to medical conditions is not sufficient to state a claim where prison

4   officials found inmate did not meet criteria for transfer).

5        ii.    <u>Plata order to adopt cocci exclusion policy does not establish an Eighth</u>

6                <u>Amendment right not to be exposed to Valley Fever</u>

7   Plaintiffs also argue that the June 2013 order in <u>Plata v. Brown</u>, No. C01-1351 TEH, 2013

8   WL 3200587(N.D. Cal. June 24, 2013), supports their argument that housing inmates in endemic

9   areas would violate the Eighth Amendment.  In <u>Plata</u>, the court was considering the plaintiffs'

10   request that the Receiver's cocci exclusion policy be implemented.  The court ordered that the

11   CDCR "adopt a modified version of the Receiver's cocci exclusion policy that reflects

12   Defendants' agreement to transfer all inmates who are classified as 'high-risk' under the medical

13   classification system and is consistent with the factors identified by the American Thoracic

14   Society as creating an increased risk of severe cocci."  2013 WL 3200587, at *14.  The Court

15   notes that <u>Plata</u> is a class action in which the prison health care system was found to be deficient

16   and the Federal Receiver was appointed to oversee the system.  The <u>Plata</u> court only considered

17   the effects of Valley Fever on inmates and did not address whether housing inmates in the San

18   Joaquin Valley where they are exposed to Valley Fever would violate the Eighth Amendment.

19   Further, while a state may adopt a policy which is more generous than what the Constitution

20   requires, <u>United States v. Heffner</u>, 420 F.2d 809, 812 (4th Cir. 1969), the policy itself does not

21   establish that environmental exposure to Valley Fever violates the Eighth Amendment.

22   It is rare that in the absence of "any published opinions on point or overwhelming

23   obviousness of illegality" that a court could "conclude that the law was clearly established on the

24   basis of unpublished decisions only."  <u>Sorrels v. McKee</u>, 290 F.3d 965, 971 (9th Cir. 2002).

25   Review of the case law demonstrates that while the law in this area is in the process of becoming

26   established, it is not clearly established even today that housing inmates, even those at an

27   increased risk for developing disseminated disease, in an endemic area would violate the Eighth

28   Amendment.

iii.     Prior orders finding Defendants' are not entitled to qualified immunity

Finally, Plaintiffs cite to both Jackson and Smith v. Schwarzenegger, No. 07-cv091547 SRB (PC), 2015 WL 106337 (E.D. Cal. Jan.7, 2015) which found that defendants are not entitled to qualified immunity based upon Helling.  However, as discussed above, this Court finds Helling to be distinguishable as it did not deal with a naturally occurring condition to which a large segment of society chooses to tolerate.  Further, the Court finds that the right to be addressed was incorrectly defined in Jackson.  Therefore, the Court does not find the reasoning in the opinions to be persuasive on the issue of qualified immunity in this instance.

Based upon the review of case law within this Circuit, it is subject to debate whether housing an inmate, even a high risk inmate, in an area where he would be exposed to Valley Fever would violate the Eighth Amendment.

**d.     Inmates at an Increased Risk of Developing Disseminated Disease**

In this action, Plaintiffs are alleging that many of them are at an increased risk of developing disseminated disease due to their race or health conditions.  Plaintiffs argue that even if it is not clearly established that it would violate the Eighth Amendment to house any inmate in the endemic area, the fact that certain inmates are at a higher risk of harm is sufficient to place prison officials on notice that they cannot be housed in these areas.  At the April 29, 2015 hearing, the Court inquired how Defendants would be on notice of when an increased risk would be sufficient to violate the Eighth Amendment.  Plaintiffs responded that any increased risk is sufficient to place Defendants on notice that housing them in an endemic area would violate the inmate's rights.

However, more than half of the residents of the affected areas fall with the groups that Plaintiffs identify as being at high risk.  See footnote 9.  In Castro, the Ninth Circuit recognized that "an officer is entitled to qualified immunity when the transition from a risk of *some* harm to a *substantial* risk of *serious* harm would not have been clear to a reasonable prison official."  Castro, 2015 WL 1948146, at *7 (emphasis in original).

Additionally, as discussed above, courts are not clear on whether an inmate can state a claim or what would be required for an inmate to state a claim due to being at an increased risk of

contracting Valley Fever.  In this instance, the Court finds that it would not be clear to prison officials at what point an inmate's increased risk of developing disseminated disease due to his race or health conditions would rise to a substantial risk of serious harm.[11]

Therefore, Defendants are entitled to qualified immunity for housing inmates who are at an increased risk of developing disseminated disease in the endemic areas.

**e.      The Law is Not Clearly Established that Exposing an Inmate to the Environmental Risk of Valley Fever Violates the Eighth Amendment**

The Court finds no binding precedent, and lower court cases are unclear, on when or if it would be a violation of an inmate's Eighth Amendment rights to be housed in an area where Valley Fever is prevalent.  While Plaintiffs allege that they were subjected to Cruel and Unusual Punishment by being housed in areas where Valley Fever is prevalent, at least a million individuals live in the San Joaquin Valley and are exposed to Valley Fever.  Similarly, tens of thousands of individuals live, work, and raise families in the areas that are the most endemic.

Although some studies and reports have recommended considering relocating inmates to reduce the risk of Valley Fever infection, neither the State of California nor the federal government have implemented any standards or restrictions on exposure to Valley Fever.  Similarly, the recommendations have not been issued to any sector of the general public to relocate out of the area.  Prison officials could reasonably believe that since the government has not found it unsafe for non-imprisoned individuals to reside in areas in which Valley Fever spores are prevalent that it would not violate the Eighth Amendment to incarcerate inmates in these same areas.  Carroll, 255 F.3d at 473.

Finally, it is clear that even for those individuals that are at a higher risk from Valley Fever, exposure to Valley Fever is a risk that society tolerates.  The Seventh Circuit found it would be inconsistent to find that prisoners are entitled to a healthier environment than substantial numbers of non-imprisoned Americans.   Carroll, 255 F.3d at 473.   More than half of the

---

[11] Similarly, while Plaintiffs allege that the rate of infection within the prison was higher than the rate of infection for residents within the surrounding community, it would not be clear at what point this would transition to a substantial risk to inmates that would violate the Eighth Amendment.

1    individuals who reside in the endemic areas belong to racial groups which Plaintiffs identify

2    as high risk.  See footnote 9.

3           The Court finds that it is not beyond debate whether housing inmates in prisons in areas

4    endemic for Valley Fever, a naturally occurring soil-borne fungus which can lead to serious

5    illness, would violate their rights under the Eighth Amendment.  al-Kidd, 131 S. Ct. at 2083.  For

6    the reasons stated, the Court finds that the right alleged here is not clearly established.

7    Defendants did not have fair notice that exposing inmates to an environmental risk of Valley

8    Fever would violate the Eighth Amendment.[12]  Chappell, 706 F.3d at 1057 (court is to consider

9    whether an officer would have fair notice that his conduct was unlawful and that any mistake to

10   the contrary would be unreasonable).  Therefore, the Court finds that Defendants are entitled to

11   qualified immunity on Plaintiffs' claims arising out of being housed at a prison where they were

12   exposed to Valley Fever.  It is recommended that Defendants' motions to dismiss on the ground

13   that they are entitled to qualified immunity be granted.[13]

---

14

15   [12] The Court is aware of two unpublished Ninth Circuit cases which addressed exposure to a contagious disease.
     Brigaerts v. Cardoza, 952 F.2d 1399, at *2 (9th Cir. 1992) (repeated exposure to contagious disease may violate the

16   Eighth Amendment), and Muhammad v. Turbin, 199 F.3d 1332, at *1 (9th Cir. 1999) (exposure to chicken pox and
     tuberculosis).  The Court finds these cases distinguishable.  Contemporary standards of decency are violated where

17   an individual with active chicken pox or tuberculosis exposes healthy individuals to the disease.  While today's
     society does not tolerate healthy individuals being exposed to people with contagious diseases, Valley Fever is not a

18   contagious disease and as discussed exposure to Valley Fever is a risk that society tolerates.

19   [13] Plaintiffs also allege that Defendants were deliberately indifferent by failing to implement mitigation measures to
     protect them from exposure to Valley Fever.  However, for the reasons discussed above, Defendants are entitled to

20   qualified immunity for not implementing mitigation measures.  While Plaintiffs contend that Defendants should have
     implemented measures including "landscaping, paving, soil stabilization, limiting and strictly controlling excavation

21   and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and
     providing respiratory protection for inmates who worked outdoors or went out under adverse conditions", inmates

22   incarcerated at prisons in the San Joaquin Valley are exposed to the same environmental conditions that exist for
     those non-incarcerated individuals residing in the same areas.  The San Joaquin Valley is California's top agricultural

23   producing region and three quarters of California's dairy cows are located here.  United States Environmental
     Protection Agency, Region 9 Strategic Plan, 2011-14, located at http://www.epa.gov/region9/strategicplan/

24   sanjoaquin.html.  The San Joaquin Valley is home of the worst air quality in the country and has some of the highest
     rates of childhood asthma due to the unique topography and wind patterns.  Id.  The San Joaquin Valley contains

25   large areas of exposed soil which is stirred up by wind and farming exposing residents to Valley Fever spores.  The
     Court takes judicial notice of information displayed on government websites and news releases where neither party

26   can dispute the accuracy of the information contained therein.  Daniels –Hall v. National Educ. Ass'n, 629 F.3d 992,
     998-99 (9th Cir. 2010) (government websites); In re American Apparel, Inc. Shareholder Litigation, 855 F.Supp.2d

27   1043, 1062 (C.D. Cal. 2012) ("Courts in the Ninth Circuit routinely take judicial notice of press releases.").  See
     Blowing dust forecast for Valleys west side Tuesday, Fresno Bee, (October 13, 2014), http://www.fresnobee.com/

28   2014/10/13/4177039_blowing-dust-forecast-for-valleys.html?rh=1; 14 Killed, 114 Hurt in I-5 Pileups:Traffic: More
     than 100 vehicles collide in dust storm north of Coalinga, Los Angeles Times (November 30, 1991),

**B.      Supplemental Jurisdiction**

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which the district court has original jurisdiction, the district court "shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III. . . ."  "[O]nce judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary."  Acri v. Varian Assoc., Inc., 114 F.3d 999, 1000 (9th Cir. 1997). "The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Supreme Court has cautioned that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).

This action is still at the pleading stage and the Court finds that Defendants are entitled to qualified immunity on the Eighth Amendment claim.  Therefore, it is recommended that the Court exercise its discretion to dismiss the state law claims.  Since this Court is recommending this action be dismissed, it will decline to address the parties' arguments regarding whether the individual Plaintiffs have complied with the California State Tort Claim Act.[14]

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.      Defendants Beard, Brazelton, Cate, Hartley, Hubbard, Hysen, Kernan, Meyer, Rothchild, Schwartz-Reagle, Schwarzenneger, and Yates' motion to dismiss be granted;

---

http://articles.latimes.com/1991-11-30/news/mn-94_1_dust-storm (last visited May 18, 2015); Gusts shroud Valley in dust as cold storm moves in, Fresno Bee (June 5, 2012), http://article.wn.com/view/2012/06/05/ gusts_shroud_valley_in_dust_as_cold_storm_moves_in/ (last visited May 18, 2015).  As discussed herein, the Court finds no precedent to place Defendants on notice that they are required to provide inmates with a safer environment that that of non-incarcerated individuals residing in the same area.

[14] Similarly, the Court declines to address the other issues raised in Defendants' motions to dismiss at this time.  Should this action survive, the Court will address any remaining arguments raised in Defendants' motion to dismiss at that time.

2.      Defendants' Winslow and Igbinosa's motion to dismiss be granted;

3.      The Court decline to exercise supplemental jurisdiction over the state law negligence claims; and

4.      This action be dismissed on the ground that Defendants are entitled to qualified immunity.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 19, 2015**

UNITED STATES MAGISTRATE JUDGE